LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
EXPRESS SEA TRANSPORT CORPORATION
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

THE RICE COMPANY,                                    :
                                                     :
                              Plaintiff,             :      07 Civ. 7077 (WHP)
                                                     :
        - against -                                  :      ECF Case
                                                     :
EXPRESS SEA TRANSPORT CORPORATION,                   :
                                                     :
                              Defendant.             :
                                                     :
-----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ATTACHMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................................1

STATEMENT OF FACTS ................................................................................................................2

ARGUMENT.....................................................................................................................................3

POINT ONE
IT IS PLAINTIFF'S BURDEN TO PROVE WHY THE ATTACHMENT SHOULD NOT BE
VACATED ........................................................................................................................................3

POINT TWO
PLAINTIFF HAS UNCLEAN HANDS AND IS NOT ENTITLED TO USE
THE EX PARTE ATTACHMENT REMEDY FOR THE IMPROPER PURPOSE OF
SECURING A CLAIM THAT AROSE FROM AN ILLEGAL VOYAGE TO IRAN
.........................................................................................................................................................4

POINT THREE
VACATUR IS APPROPRIATE WHERE DEFENDANT HAS
REPEATEDLY OFFERED, AND PLAINTIFF HAS UNREASONABLY
REFUSED, TO ACCEPT SUBSTITUTE SECURITY TO SECURE ALL CLAIMS
.......................................................................................................................................................11

POINT FOUR
ALTERNATIVELY, PURSUANT TO ADMIRALTY
RULE E(6) THE COURT SHOULD REDUCE THE
ATTACHMENT FROM $4,946,170.13 TO $1,324,804.71
.......................................................................................................................................................16

POINT FIVE
IF THE COURT DECLINES TO VACATE THE ATTACHMENT,
THE PLAINTIFF SHOULD BE ORDERED TO POST COUNTERSECURITY FOR
DEFENDANT'S COUNTERCLAIM PURSUANT TO ADMIRALTY RULE E(7)(a)
.......................................................................................................................................................22

CONCLUSION.................................................................................................................................24

## PRELIMINARY STATEMENT

Defendant, Express Sea Transport Corp. (hereinafter "ESTC" or "Defendant"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, submits the within Memorandum of Law in Support of its Motion to Vacate, or alternatively, reduce the Ex Parte Order of Attachment ("Order") obtained by Plaintiff, The Rice Company (hereinafter "TRC" or "Plaintiff"), pursuant to Rules E(4)(f) and E(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Admiralty Rules"). In the further alternative, ESTC moves for countersecurity pursuant to Admiralty Rule E(7)(a).

At TRC's behest, on August 9, 2007 the Court issued the Order against ESTC's property in the sum of $4,946,170.13. TRC has sought to attach ESTC's property as security for TRC's dubious claim emanating from an alleged breach by ESTC of an April 4, 2007 charter party between them. More specifically, TRC, a U.S. company, came to this Court and obtained an equitable remedy, but did so with unclean hands because it had violated U.S. law that prohibits trading with Iran. Stated differently, TRC requires this Court's assistance to secure a claim for alleged damages that resulted from the breach of a contract that required M/V APOSTOLOS II to discharge its cargo in Bandar Imam Khomeini, Iran in contravention of Executive Order 13059. See supra Point II. TRC was aware that its voyage to Iran would violate U.S. law; this is demonstrated by its own written instruction to the Vessel, which explained that TRC was employing the services of its offshore affiliate, Helena Chartering of the Bahamas, as a buffer to distance itself from that violation. Of note, TRC's substantive claim will be decided in an ongoing London arbitration. Thus, this proceeding is merely ancillary to the arbitration and is for the sole purpose of obtaining security.

Additionally, TRC obtained the Order notwithstanding the fact that ESTC had *repeatedly* offered to voluntarily provide security. This fact tends to demonstrate that TRC's motive may be less about securing its claims and more about increasing its leverage. Tellingly, TRC has flatly rejected ESTC's offers to post security without any constructive counter. The product of TRC's unreasonable refusals is an Order, that has caused substantial and unnecessary disruption to ESTC's business. There is *no* basis for TRC to be permitted to continue to serve the Order because the arbitration has already commenced in London and because ESTC remains ready and willing to provide security.

Further, TRC's claim is grossly overstated. Accordingly, should the Order survive, the Court should modify and reduce it pursuant to Admiralty Rule E(6). Also, should the Order survive the Court should grant ESTC countersecurity on its counterclaim pursuant to Admiralty Rule E(7).

For these reasons, and for the reasons explained in the accompanying Declaration of Hugh Maxwell Townson, the Order should be vacated or, alternatively, reduced because: (1) TRC came to this Court with unclean hands and with a dubious claim that stems from its illegal trade with Iran; (2) TRC is not entitled to the Order where it has unreasonably refused to accept repeated offers by ESTC to post security; and (3) TRC's alleged damages of $4,946,170.13 are grossly exaggerated where the outside amount that TRC might recover in arbitration will not exceed $1,324,804.71. In the further alternative, TRC should be ordered to post countersecurity in the amount of $474,020.67.

## STATEMENT OF FACTS

On or about April 4, 2007, TRC, as charterer, and ESTC, as disponent owner, entered into a time charter party for the charter of the M/V APOSTOLOS II ("Vessel") for a period of between

2

eleven and thirteen months. Disputes arose in respect of *inter alia* unpaid hire. The parties are engaged in London arbitration to resolve their claims.

TRC initiated this case on August 9, 2007 by filing a Verified Complaint. It alleged damages, inclusive of attorneys' fees and costs, in the amount of $4,946,170.13. It prayed for the issuance of Process of Maritime Attachment and Garnishment pursuant to Admiralty Rule B, which subsequently issued. No funds have been restrained.

For additional facts, reference is made to the supporting Declaration of Hugh Maxwell Townson and the exhibits attached thereto. Excerpts from Mr. Townson's Declaration are reprinted below and incorporated in the five argument points that follow.

## ARGUMENT

### POINT I

### IT IS PLAINTIFF'S BURDEN TO PROVE
### WHY THE ATTACHMENT SHOULD NOT BE VACATED

A Plaintiff that has obtained and an ex parte Rule B attachment order must shoulder the burden at the post-attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty claim against the defendant." *See* Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434, 445 (2d Cir. 2006). Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Id.

It is the plaintiff's burden to prove that the attachment is proper. The Second Circuit Court of Appeals commented on Rule E(4)(f) in Aqua Stoli and explained the following standard:

3

[A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n5.

n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

Aqua Stoli, 460 F.3d at 445.

Former Local Rule 12, to which the Second Circuit cited in note 5 of Aqua Stoli, provides as

follows:

Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with theses rules or the supplemental rules.

Id. In this case, TRC must prove that the Order was properly issued. It must also rebut ESTC's

showing that the attachment is so manifestly inequitable so as to warrant vacatur.

## POINT II

### PLAINTIFF HAS UNCLEAN HANDS AND IS NOT ENTITLED TO USE THE EX PARTE ATTACHMENT REMEDY FOR THE IMPROPER PURPOSE OF SECURING A CLAIM THAT AROSE FROM AN ILLEGAL VOYAGE TO IRAN

The Order should be vacated where TRC has alleged damages in respect of a breach of a

contract that required the Vessel to discharge her cargo in Iran. TRC knew well that the voyage was

illegal under U.S. law, which is why it employed its offshore affiliate, Helena Chartering of

Bahamas, to act as intermediary. Under these facts, TRC has unclean hands and should not be

4

permitted to use Admiralty Rule B to derive a benefit from its wrongful act. As held by the Second

Circuit Court of Appeals in PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir.

2004), a party who comes to the Court with unclean hands will not be entitled to invoke the court's

equity lest it would make the court the abettor of iniquity. Specifically, the PenneCom B.V. court

held as follows:

> New York courts have long applied the maxim that one "who comes to equity must
> come with clean hands." Amarant v. D'Antonio, 197 A.D.2d 432, 434, 602 N.Y.S.2d
> 837, 838 (N.Y. App. Div. 1993). Cf. Keystone Driller Co. v. Gen. Excavator Co.,
> 290 U.S. 240, 241, 244-45, 78 L. Ed. 293, 54 S. Ct. 146, 1934 Dec. Comm'r Pat. 639
> (1933). Courts apply the maxim requiring clean hands where the party asking for the
> invocation of an equitable doctrine has committed some unconscionable act that is
> "directly related to the subject matter in litigation" and has injured the party
> attempting to invoke the doctrine. Weiss v. Mayflower Doughnut Corp., 135 N.E.2d
> 208, 210, 1 N.Y.2d 310, 316, 152 N.Y.S.2d 471, 474 (1956). The Supreme Court,
> explaining the rationale behind the doctrine of unclean hands, has stated that "the
> equitable powers of this court can never be exerted in behalf of one who has acted
> fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a
> party in such a case would make this court the abettor of iniquity." Bein v. Heath, 47
> U.S. 228, 247, 12 L. Ed. 416 (1848).

PenneCom B.V., 372 F.3d at 493. In this case, TRC does not have clean hands where it looks to be

rewarded for its illegal act of ordering the Vessel to carry cargo to Iran. While not disclosed in the

Verified Complaint, the voyage at issue at the time of ESTC's withdrawal of the Vessel was from

Bunbury, Australia to Bandar Imam Khomeini, Iran. Specifically, pursuant to TRC's voyage

instructions, the Vessel was en route Iran with a cargo of 33,455 metric tones of Sandy Calcined

Metallurgical Grade Alumina.

The U.S. trade sanctions in respect of Iran are contained in Executive Orders 12957, 12959

and 13059, as well as the Libya-Iran Sanctions Act of 1996. The starting point is the definition of

"U.S. Person" under the Executive Order. Section 4 of Executive Order 13059 states:

    For the purpose of this order:

    (a) the term "person" means an individual or entity;

5

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States;

(d) the term "Iran" means the territory of Iran and any other territory or marine area, including the exclusive economic zone and continental shelf, over which the Government of Iran claims sovereignty, sovereign rights, or jurisdiction, provided that the Government of Iran exercises partial or total de facto control over the area or derives a benefit from economic activity in the area pursuant to international arrangements...

Id. TRC would fall within the definition of "United States person" in section 4(c) of the Executive

Order since it is a United States citizen. Paragraph Two of TRC's Verified Complaint explains that

TRC is a corporation or other business entity organized and existing by virtue of one of the states of

the United States of America with an office and place of business at 1624 Santa Clara Drive,

Roseville, CA 95661. Unlike TRC, ESTC is not a U.S. person.

With regard to whether a U.S. person may trade with Iran, Executive Order 13059 section

2(a) specifically excludes the following activity:

(a) the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(ii) such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran...

Id. Thus, under the Executive Order, TRC is prohibited from rendering goods or services to Iran.

6

TRC has violated U.S. law because the loss of profit for which it seeks attachment includes

prospective earnings for a voyage to Bandar Imam Khomeini, Iran. In this regard, TRC's email to

the Vessel dated June 12, 2007 stated as follows:

> Please note that your good vessel will be calling Iran, hence for this reason your
> vessel has been fixed on a back to back basis between TRC and our freight company
> M/s Helena Chartering of Bahamas. The fixture with Klaveness is with Helena
> Chartering, Bahamas. I am sending you a test message through Helena Chartering
> and would appreciate if you could henceforth send all messages to
> freight@helenachartering.com.

See Townson Decl. at ¶ 15 and Exhibit "5" annexed thereto. TRC's email tends to prove that it

knew that its voyage to Iran would violate U.S. law relating to trading with the enemy, and that it

was trying to distance itself from that violation by using its offshore affiliate, Helena Chartering of

the Bahamas. See Townson Decl. at ¶ 16. Under these circumstances, ESTC's counsel wrote to

TRC's counsel on July 26 and 31, 2007, as well as on August 9 and 14, 2007, to ask whether TRC

held a license from the U.S. Treasury Department, Office of Foreign Asset Control ("OFAC") in

respect of the voyage to Iran. Id. TRC never responded. Id. Based on the foregoing, the Court

may correctly conclude that TRC's orders to the Vessel to proceed to Iran amounted to a violation

of U.S. law. Since that illegal voyage was being performed when the Vessel was withdrawn from

TRC by ESTC, and TRC is claiming damages from that moment forward, TRC is, in essence,

asking this Court to assist it in trying to recover alleged lost profits that arise from an illegal trade.

See Townson Decl. at ¶ 16. As such, TRC's use of the attachment remedy is improper, unfair and

abusive.

In such cases, the Court is empowered to vacate because "[t]he inherent power to adapt an

admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the

district judge sitting as an admiralty judge . . . ." Greenwich Marine. Inc. v. S.S. Alexandra, 339

F.2d 901, 905 (2d Cir. 1965). By way of further legal authority, notwithstanding that in Aqua Stoli

7

the exact scope of the district court's vacatur power was not before the Second Circuit, the Court held nevertheless that given the exceptional remedy of maritime attachments, a district court has the inherent authority to vacate an abusive or otherwise unfair attachment. See id. at 442-445. The Court so held in the context of praising Judge Leval's holding in Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119 (S.D.N.Y. 1979). "Then-District Judge Leval astutely noted, however, the possibility of abuse by the attaching party in some circumstances." Aqua Stoli, 460 F.3d at 442. One such case of abuse occurs when a party who can by "found" within the Southern District of New York has its property restrained "across the river" in the Eastern District of New York. In Integrated Container, Judge Leval held that where there is an "abusive use of the maritime attachment remedy…the courts may easily remedy the situation by exercising discretion to set aside an unfair attachment." Integrated Container, 476 F.Supp. at 124. Based on the facts of Integrated Container, an "across the river case," Judge Leval held that the attachment was not unfair because "there can be no doubt that the plaintiffs' need for security is real, [and] that their quest for attachment is not a tactic of harassment." Id.; see also Central Hudson Gas and Elec. Corp.v. Empresa Naviera Santa, SA, 845 F.Supp. 150, 153 (S.D.N.Y. 1994)("The Rule was not abused, inasmuch as there was a substantial risk that [plaintiff] would not be able to locate sufficient assets to satisfy its claims, which in turn were not frivolous.").

Furthermore, "a district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff.'" Blake Mar., Inc. v. Petrom S.A., 05 Civ. 8033, 2005 U.S. Dist. LEXIS 26310, 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting Southern District of New York Former Local Civil Rule 12 (1986)). While an attachment may be vacated where a plaintiff cannot demonstrate that it has satisfied the technical requirements of Rule B, your Honor held that "[c]ourts may also vacate an

8

attachment in certain limited circumstances where equity so demands." Flame Maritime Ltd. v.

Hassan Ali Rice Export Co., 07 Civ. 4426 (WHP), 2007 U.S. Dist. LEXIS 64470, *4 (S.D.N.Y.

August 31, 2007)(citing Aqua Stoli, 460 F.3d at 444).

Decisions that have vacated attachments obtained to secure frivolous claims are instructive

in this case because in both instances the attachments were unfair and initiated for improper or

abusive purposes. In Rolls Royce Industrial Power, (INDIA) v. M.V. FRATZIS, 95 Civ. 2630

(CSH), 119 AMC 393, 397, 1996 U.S. Dist LEXIS 4907 (S.D.N.Y. April 15, 1996), Judge Haight

held that the appropriate three-part analysis to be undertaken by the Court in such situations is as

follows:

> [T]here are three questions which arise out of the authorities cited [including
> Admiralty Rule E(4)(f), Admiralty Rule E(6) and former Local Admiralty Rule 12]
> and others, to which I will come...
>
> The first: Is the plaintiffs' claim so lacking in merit as to be characterized as
> frivolous?
>
> If that question is answered in the negative, then one comes to the second question
> which is: In obtaining the attachment at issue, have the plaintiffs engaged in
> improper practices to such a degree, or do the circumstances reveal a want of equity
> so manifest, as to require that the attachment be vacated in its entirety?
>
> And the third question, if that be answered in the negative, is this: Is the amount
> attached excessive or is it reasonably necessary to secure the plaintiffs claims?

Rolls Royce Industrial Power, (INDIA). 119 AMC at 397.

Similarly, in Bay Casino, LLC v. M/V ROYAL EMPRESS, 1999 U.S. Dist. LEXIS 22357

(S.D.N.Y. 1999), in the context of a defendant's challenge to a maritime attachment, and where the

plaintiff had furnished the court with misleading information regarding projected profits and actual

costs, the court held that "plaintiff's lost profits claim is frivolous and, therefore, improperly

included as part of the security." Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *3-4. The Bay

Casino court further held that the claim was frivolous because the very existence of the damages

9

were uncertain, *i.e.*, where profits were speculative at best, and that recovery was unwarranted where the plaintiff could not potentially prove loss to a reasonable certainty standard. "It is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims are not frivolous." *Id.* at *3 citing Dongbu Express Co. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996). Addressing New York law, the court rejected the plaintiff's lost profits claim and partially vacated the attachment because allowing security for a frivolous claim would have put the plaintiff in a better position than it otherwise would have been without the defendant's involvement. The Bay Casino court held as follows:

> Several grounds for such a finding [that the claim was frivolous] were apparent in both the parties' pleadings and in their representations to the Court in the hearing on this matter.
>
> ***
>
> While the plaintiff has a much lighter burden of proof in this [Rule E(4)(f)] proceeding than at trial, the Court can find no basis in law or in fact to find plaintiff's claim non-frivolous...
>
> Additionally, neither in their pleadings, nor in their representations to this Court has plaintiff provided the Court with an evidentiary basis for historical profits that would indicate plaintiff's claims for lost profits constitutes anything more than bald speculation. Absent this, especially in consideration of the fact that plaintiffs are marketing...a consumer driven, highly volatile venture [,] plaintiff cannot potentially prove loss to a reasonable certainty.
>
> ***
>
> Defendants cite Rolls Royce v. Fratzis M., 1996 AMC 393, 396 (S.D.N.Y. 1995) in heralding the Court's responsibility to address the question of:
>
>> In obtaining the attachment...have the plaintiffs engaged in improper practices to such a degree or do the circumstances reveal a want of equity so manifest, as to require the attachment to be vacated in its entirety.
>
> In reducing security, this Court is mindful of its discretion under both law and equity. Since plaintiffs will not be able to prove a claim for lost profits based solely on questionable projections, unsupported by historical profits, the Court declines to

10

secure the claim...Considering the facts at bar, this Court considers that clear
guidance in determining plaintiff's lost profits claim is frivolous. Thus, plaintiff's
claim for lost profits will not be considered in calculating an appropriate security.

Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *4-7.

As applied to this case, the Order should be vacated where TRC is seeking to secure its
claim that arose from a voyage that violated U.S. law. Given this, TRC is not entitled to the
exceptional attachment remedy. To allow the Order to survive would be to condone TRC's use of
one U.S. law in order to reap the benefit of its having violated another U.S. law. Thus, equity
dictates that the Order be vacated.

## POINT III

### VACATUR IS APPROPRIATE WHERE DEFENDANT HAS REPEATEDLY OFFERED, AND PLAINTIFF HAS UNREASONABLY REFUSED, TO ACCEPT SUBSTITUTE SECURITY TO SECURE ALL CLAIMS

"[V]acatur is proper if "the plaintiff has already obtained sufficient security for the potential
judgment by attachment or otherwise." Flame Maritime Ltd. v. Hassan Ali Rice Export Co., 07
Civ. 4426 (WHP) 2007 U.S. Dist. LEXIS 64470, *4 (S.D.N.Y. August 31, 2007) quoting Aqua
Stoli, 460 F.3d at 445. While it is true that TRC currently enjoys no security, this is because TRC
has unreasonably refused to accept security. One inference to be drawn from TRC's refusal is that
TRC is employing the attachment remedy for the improper purpose of harassment, *i.e.*, to gain an
undue advantage over ESTC by causing a business disruption.

The Order is unwarranted and inappropriate given that ESTC offered to provide TRC with
security for its claim, and that this offer remains open, without a satisfactory and/or full answer
from TRC as to why it is unacceptable. See Townson Decl. at ¶ 4. ESTC first informed TRC that it
was willing to provide security in respect of TRC's reasonably estimated claim on July 11, 2007,
over one month before TRC filed this action. See Townson Decl. at ¶ 5. The precise form of the

11

security was not discussed at this stage, and ESTC had it in mind that it would be a matter for discussion or negotiation between the parties in an ordinary commercial manner. Id. At the same time, in an effort to ensure that no unnecessary, inappropriate or precipitate steps were taken by TRC to obtain security in respect of its claim, e.g., by taking action against ESTC's assets, ESTC also requested that TRC inform any relevant court of ESTC's willingness to provide security. Id.

TRC did not respond to or in any way acknowledge that offer. See Townson Decl. at ¶ 6. Therefore, on July 24, 2007, ESTC's London solicitors, Reed Smith Richards Butler ("RSRB"), wrote to TRC's London solicitors, Winter Scott ("WS"), to repeat that ESTC was willing to provide security for TRC's claim, and this time (in the absence of any response to the first message concerning security) to set out ESTC's proposals as to the form and terms of that security. See Townson Decl. at • 6. RSRB's message stated as follows:

> "... it is obviously in both parties' interests that your client's claim is resolved sensibly, quickly, and with minimum fuss. With that in mind, and notwithstanding that your client has not yet requested security for its claim, we are instructed to inform you that ESTC is in principle prepared to provide TRC with security in the form of an ESTC letter of undertaking. subject to agreement between the parties as to the terms of that LoU and on quantum. In the absence of such agreement, with a view to avoiding any unnecessary expense and delay in connection with the provision of security, ESTC would be prepared to refer to the Tribunal for a determination.

> We are also instructed to inform you that ESTC is willing in principle to replace the LoU with a bank guarantee in the event TRC obtains an award in its favour in the arbitration and ESTC appeals that award (and for appropriate provision to be made in that respect in the LoU".

See Townson Decl. at ¶ 6 and Exhibit "1" annexed thereto.

Despite RSRB's chaser on July 31, 2007, TRC failed to acknowledge or otherwise respond to ESTC's offer of July 24, 2007 in the sixteen-day period, which elapsed between the offer and the filing of this action on August 9, 2007. See Townson Decl. at ¶ 7.

12

Further, as ESTC understands it, despite ESTC's specific request on July 11, 2007, neither the fact of ESTC's offers to provide security, nor TRC's failure to answer, explore further or even reject the offer was mentioned by TRC or its attorney in its Verified Complaint or otherwise in connection with the Application.

In fact, it was only after RSRB wrote to WS on Friday, August 24, 2007 to: (a) inform WS that ESTC had become aware of the Attachment; (b) request an explanation as to TRC's actions obtaining the Ex Parte Order in circumstances where an offer for the provision of security was open and remained unanswered by TRC; and (c) repeat the offer made on July 24, 2007; that TRC finally responded to that offer (by way of a WS fax, received by RSRB at 18:39 London time on Friday, August 24, 2007, some forty-four days after ESTC's initial offer on July 11, 2007 and thirty-one days after the July 24, 2007 offer). See Townson Decl. at ¶ 9. However, that response amounted to a bald rejection of ESTC's offer, lacking any explanation as to why TRC had determined to make the application for the Ex Parte Order rather than accept or explore ESTC's offer. Id. WS stated that:

"... *our Clients did not consider that a letter of undertaking from your clients themselves, not being countersigned by a first class bank, offered much comfort to them.*"

See Townson Decl. at ⸢ 9 and Exhibit "2" annexed thereto.

Against that background, on August 28, 2007 (following the public holiday in England on August 27, 2007), RSRB wrote to WS: (a) to explain why the security offered by ESTC was in ESTC's view reasonable and satisfactory; (b) to remind WS and TRC that ESTC's offer of July 24, 2007 included provision for reference to the London arbitral Tribunal in the absence of agreement as to form and terms of security; (c) in an effort to reach a quick resolution, also to offer alternative security by way of bank guarantee; and (d) to request that TRC withdraw this action forthwith.

13

See Townson Decl. at ¶ 10. In material part, RSRB's message stated as follows:

*"If you or your clients had any misgivings about the security proposal then on the table, it is perverse for you to run off to the SDNY to make an expensive application rather than to take the basic professional and reasonable courtesy of responding to our email.*

*You have also failed to explain why the security proposed was actually of no comfort to TRC. Perhaps that is hardly surprising, because there is in fact no good reason at all. We note that whilst TRC asked ESTC to take on substantial exposure by accepting a TRC letter of undertaking in respect of their orders to deliver cargo in Iran without the presentation of original bills of lading, they are not prepared to take a similar letter from ESTC. It is unreasonable, for example, that TRC should expect to give a letter for the delivery of the cargo in Iran, without counter-signature by any bank, yet expect ESTC to provide a bank guarantee to them for a speculative claim for wrongful withdrawal of the ship from charter.*

*TRC can have no reason whatsoever to suppose that ESTC would renege on an undertaking either to meet an adverse Award or to provide the bank guarantee to secure it whilst it was under appeal in accordance with the offer. They have no evidence, for there is none, of ESTC's non-payment of an adverse arbitration award, nor of meeting any obligations secured by an undertaking. Neither do they have any reason to suppose that ESTC are any less jealous of their reputation within the market place than are TRC. Beyond that, even if TRC's worst fears were realized and they were left with a damages claim for breach of agreement, they would still have recourse to the action they have so recently taken.*

*... The fact is that ESTC offered security to TRC in order that the issues arising from the withdrawal of the ship could be discussed and settled reasonably, straight-forwardly, without rancour, without business interruption and without the matter of security being adopted as a weapon in the cause. It is quite clear that TRC have made this unconscionable move in an attempt to increase their bargaining leverage.*

*...If TRC are adamant that it is absolutely necessary to have urgent security for their claim in the form of a bank guarantee, then ESTC are content to provide the same forthwith against TRC undertaking to answer for the costs of the same from the date of establishing it until the date of payment of an adverse award or settlement or until the date of either party filing an application to appeal the award. In the alternative, ESTC are content to repeat their earlier offer of an ESTC letter of security, first made over a month ago, which they propose as reasonable or, to join with TRC in an invitation to the arbitration Tribunal, now constituted, to order on security (i) as to wording, (ii) as to form and (iii) as to amount, in the absence of agreement on these points between the parties.*

14

*In any event, it must on any reasonable view be inappropriate for TRC to continue with their inexplicable proceedings in the United States. We therefore look forward to your urgent confirmation that those proceedings will be withdrawn forthwith."*

See Townson Decl. at ¶ 10 and Exhibit "3" annexed thereto.

WS responded to that message by way of a fax received by RSRB at 1849 on August 28, 2007 by stating that:

*"... it remains our Clients' position that the security previously offered by your Clients, which was not suggested to be countersigned by any bank, was wholly unacceptable".*

See Townson Decl. at ¶ 11. With regard to ESTC's offer to provide a bank guarantee, WS simply stated that:

*"we note your Clients are now prepared to put up a bank guarantee... subject to our Clients paying for the cost of this. This condition is unacceptable..."*

See Townson Decl. at ¶ 11 and Exhibit "4" annexed thereto.

On that basis, WS indicated that TRC was not prepared to withdraw the U.S. action. See Townson Decl. at ¶ 12. That position has been repeated by TRC's New York lawyers. Id. However, this leaves unanswered:

(a) *Why TRC sought the Ex Parte Order in the first instance.*

In ESTC's view, if TRC's genuine aim was to obtain security in respect of its claim, rather than another agenda, it should and would have acknowledged ESTC's offer of July 24, 2007, and if that offer was not acceptable, explored the scope for amicable agreement, for example, by specifying what amendments to the form and/or terms of security it sought, rather than simply proceeding with the Application.

(b) *Why TRC is not prepared to agree ESTC's proposal that in the absence of agreement as to the form and terms of security, the parties should refer to the Arbitration Tribunal for a determination in that respect.*

15

This would ensure that TRC is provided with security in a form and amount determined to be reasonable and appropriate by the Tribunal to whose jurisdiction the parties have submitted in respect of the substantive dispute between them.

(c) *Why ESTC's proposal (made in RSRB's fax of August 28, 2007) for the provision of a bank guarantee is not acceptable.*

WS's fax of August 28, 2007 simply amounts to a bald rejection of that proposal.

This lawsuit has resulted in both parties incurring significant costs which would have been avoided had TRC taken up ESTC's offer of security. Any attachment of ESTC's funds will further increase costs and, ultimately, is only likely to lead to the provision of the type of security now on offer from ESTC, on the basis set out in RSRB's message of August 28, 2007. An attachment would also cause significant inconvenience for ESTC's business, which given all of the above, is unwarranted and unnecessary, but perhaps what TRC really intended.

## POINT IV

### ALTERNATIVELY, PURSUANT TO ADMIRALTY RULE E(6) THE COURT SHOULD REDUCE THE ATTACHMENT FROM $4,946,170.13 TO $1,324,804.71

Alternatively, ESTC moves pursuant to Admiralty Rule E(6) for a reduction of the Order to $1,324,804.71. ESTC so moves on the basis that TRC's claims are grossly exaggerated. Admiralty Rule E(6) provides that "Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given...." Id. The Court "has power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown." See Sea Transp. Contractors, Ltd., 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006).

In Flame Maritime Ltd. v. Hassan Ali Rice Export Co., 07 Civ. 4426 (WHP) 2007 U.S. Dist. LEXIS 64470, *5 (S.D.N.Y. August 31, 2007), the Court recently held as follows:

16

"Because pre-judgment attachments are usually based upon reasonable estimates and not precise facts, parties often attach amounts which are later deemed excessive in light of changes in circumstances." Dongbu Express Co., Ltd. v. Navios Corp., 944 F. Supp. 235, 237 (S.D.N.Y. 1996). As such, "a reduction in security is 'freely granted upon a showing that the [attachment] is excessive.'" Dongbu, 944 F. Supp. at 237 (quoting 7A James W. Moore et al., Moore's Federal Practice P E14 (2d ed. 1996)); see also Fed. R. Civ. P. Supp. Rule E(6)("Whenever security is taken, the court may, on motion and hearing, for good cause shown reduce the amount of security given."); Mardas, 2007 WL 2229058, at *3 (same); Transportes Navieros y Terrestes v. Fairmount Heavy Transp. N.V., 07 Civ. 3076 (LAP), 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007)(same).

Flame Maritime Ltd., 07 Civ. 4426 (WHP), 2007 U.S. Dist. LEXIS 64470 at *5. The Court may find "good cause" to reduce the attachment where the amount of security requested, although possibly recoverable in the underlying action, runs contrary to the contract and/or facts upon which the damages are based. Thus, when finding a defendant has shown "good cause" to reduce the attachment, the court is not required to take a position on the substantive merits of the case, or as to the recovery available under applicable foreign law. See Sea Transport Contractors, Ltd. v. Industries Chemiques Du Senegal, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006); See also, Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, 2005 U.S. Dist LEXIS 224, *5 (S.D.N.Y. 2005)(where the plaintiff's estimate of damages has been challenged, the court may use its discretion to apply a reasonable estimate of those damages). As held by Judge Scheindlin, where a "[plaintiff's] claims cannot be deemed frivolous, they should be reduced to account for estimated savings" and that "in an attachment proceeding, the plaintiff need not prove its damages with exactitude" but "the court must be satisfied that plaintiff's claims are not frivolous." Dongbu Express Co. Ltd. v. Navios Corp., 944 F.Supp. 235, 237-238 (S.D.N.Y. 1996).

The case of Sea Transport Contractors, Ltd., is illustrative. There, the plaintiff maintained that it was entitled to over 75 million dollars in damages because the contract under which its claim arose was to run "interminably" and thus, such damages could be recoverable under English Law.

17

The court declined to take a position on plaintiff's claim under English law but found that good

cause had been shown that the attachment should be reduced as it appeared that the damages

requested were not in accord with the contract's provisions and the relevant facts. Judge Casey

reduced the amount of the attachment to a level that he viewed as reasonable and held:

> A district court has the inherent authority to vacate an attachment "upon a showing
> of 'any improper practice' or a 'manifest want of equity on the part of the plaintiff.'"
> Blake Mar., Inc. v. Petrom S.A., 2005 U.S. Dist. LEXIS 26310, No. 05 Civ. 8033,
> 2005 WL 2875335, at 2 (S.D.N.Y. Oct 31, 2005)(quoting Southern District of New
> York Former Local Civil Rule 12 (1986)).  The Second Circuit has held that the
> "inherent power to adapt an admiralty rule to the equities of a particular situation is
> entrusted to the sound discretion of the district judge." Greenwich Marine, Inc. S.S.
> Alexandria, 339 F.2d 901, 905 (2d Cir. 1965).

Sea Transport Contractors, Ltd., 411 F.Supp. 2d at 391.  Judge Casey held that "good cause" existed

per Rule E(6) to reduce the amount of the attachment where the complaint did not accurately allege

the amount of damages.

Quite recently, Judge Preska examined the standard for reducing an excessive attachment

under Rule E(6) in Transportes Navieros y Terrestes v. Fairmount Heavy Transport N.V., 07 Civ.

3076 (LAP), 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007).  In Transportes Navieros y

Terrestes, the court reduced the level of a maritime attachment from nearly $1,300,000 to $15,000

where Defendant showed good cause why $15,000 was the outside amount for which it might

potentially be held liable to plaintiff in the underlying foreign proceeding.  Specifically, Judge

Preska held as follows:

> Alternatively, FHT has moved pursuant to Rule E(6) for a reduction of security, i.e.,
> the release of the majority of the $ 1,256,352.84 under attachment. FHT so moves on
> the basis that TNT's damages "are either non-existent or grossly exaggerated." (See
> FHT Memo at 22.) Supplemental Admiralty Rule E(6) provides that "[w]henever
> security is taken the court may, on motion and hearing, for good cause shown, reduce
> the amount of security given . . . ." Fed. R. Civ. P. Supp. Rule E(6). The district court
> may determine what "good cause" is as the Court of Appeals has held that "[t]he
> inherent power to adapt an admiralty rule to the equities of a particular situation is

entrusted to the sound discretion of the district judge sitting as an admiralty judge . . .
." Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965).

In Dongbu Express Co. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996), the
vessel charterer sued the vessel owner and obtained a maritime attachment in the
Southern District of New York as well as in South Korea in support of a London
arbitration. The owner of the vessel moved the district court for a partial release of
the funds attached in New York on the basis that the New York attachment was
duplicative of the Korean attachment. Id. Judge Shira A. Scheindlin found that the
charterer was oversecured and ordered a partial release of the New York attachment
pursuant to Rule E(6) because the amount restrained in New York exceeded the
difference between the charterer's provable damages and the amount of the Korean
attachment. Id. Judge Scheindlin held that "in an attachment proceeding, the plaintiff
need not prove its damages with exactitude" but noted that "the court must be
satisfied that plaintiff's claims are not frivolous." Id. at 237 (citations omitted).

Similarly, in Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd., No. 05-
7173, 2005 U.S. Dist. LEXIS 22409, 2005 WL 2446236 (S.D.N.Y. Oct. 3, 2005),
Judge Naomi R. Buchwald granted the defendant's motion for a reduction in the
amount of security under Rule E(4)(f) and Rule E(6) where the plaintiff had failed to
produce evidence to the court to justify the total amount of the attachment. Judge
Buchwald ordered the release of the amount that was in excess of the funds for
which there was sufficient evidence to justify attachment. 2005 U.S. Dist. LEXIS
22409, [WL] at *2. See also Sea Transport Contractors Ltd. v. Industries Chemiques
du Senegal, 411 F. Supp. 2d 386 (S.D.N.Y. 2006) (finding "good cause" pursuant to
Rule E(6) to reduce the amount of a maritime attachment where the complaint did
not accurately allege the amount of damages as evidenced by the parties' underlying
contract).

* * *

The Court accepts that TNT has met the prima facie standard for proving that it has a
viable maritime attachment that can withstand a motion to vacate. However, the
Court also accepts the undisputed fact that TNT failed to take any step to lift the
arrest for some six months. On the basis of this undisputed fact the Court concludes
that because TNT failed to act reasonably promptly upon being informed of the
arrest of the Vessel by FHT, it failed in its duty to mitigate its damages, including
damages it knew it would be exposed to upon its entering into the Con-Dive Charter
Party after the arrest had been effected. Thus, FHT has demonstrated good cause for
a reduction in the amount of the attachment pursuant to Rule E(6). Accordingly, the
order of maritime attachment is modified to reflect the amount for which FHT may
be potentially held responsible to TNT, which the Court estimates at $15,000, the
outside amount that might be attributable to legal fees required to lift the wrongful
arrest.

Transportes Navieros y Terrestes v. Fairmount Heavy Transport N.V., 2007 U.S. Dist. LEXIS 50260 at *20.

The above authorities stand for the proposition that it is a plaintiff's burden to reasonably estimate its damages so that the court may be satisfied that the damages alleged are reasonable. Here, Plaintiff has not reasonably estimated, and in fact has greatly overstated, its damages. The greatest sum to which TRC may arguably be entitled to restrain is $1,324,804.71. The sum of US$4,108,605.00, which according to the Verified Complaint is the principal amount claimed, is a grossly inflated assessment of the loss and damage. In this regard, ESTC has the following comments on Paragraph 11 of the Verified Complaint, which particularises TRC's alleged damage. Regarding ¶ 11(c), the rate of hire under the charter party dated April 4, 2007 was $24,500 per day. Following the withdrawal of the Vessel on July 3, 2007, ESTC offered to re-charter the vessel to the TRC at a daily rate of US$28,500, which was about the market rate for the vessel at that time. See Townson Decl. at ¶ 20 and Exhibit "6" annexed thereto. On any view, TRC is not entitled to recover a sum representing hire for the "*Balance of Charter Period*" on the basis of a rate of hire of $36,409 in circumstances where (a) the market rate was about US$28,500 and (b) the vessel was re-offered by ESTC to the Plaintiff at the daily rate of US$28,500. See Townson Decl. at ¶ 21. Therefore, assuming *arguendo* that TRC's allegation that the vessel was wrongfully withdrawn is correct, its claim would be for a "*Difference per Day*" of US$4,000, rather than for the unsubstantiated sum of $11,909. See Townson Decl. at ¶ 22.

Further, nowhere has TRC explained or accounted for what earnings it might have continued to enjoy after the withdrawal: although the Vessel was withdrawn, ESTC was legally obliged to continue with the voyage to Iran, which was consistent with the purpose of the charter between the

20

TRC and Helena Chartering, and it is possible and likely that TRC continued to receive profit for the voyage to Iran that it has not disclosed to this Court. See Townson Decl. at ¶ 23.

As for Verified Complaint ¶ 11(f), taking account of the foregoing analysis with regard to paragraph 11(c) above, TRCs "*Total Anticipated Losses*" should more reasonably be $1,380,000 (*i.e.* 345days x $4,000), less any continued earnings, rather than the $4,108,605. See Townson Decl. at ¶ 24.

Regarding Verified Complaint ⁛ 11(j), TRC is not entitled to recover its costs and legal fees of this action under U.S. law (which are alleged to be $15,000) and/or security in that respect. For obvious reasons, TRC has not, and cannot, cite legal authority in support of such an entitlement.

Regarding Verified Complaint ¶ 11(k), TRC's calculation of "*Monies due TRC under final hire statement*" fails to take account of the agreement between the parties which arose out of the Vessel's withdrawal pursuant to which TRC agreed to pay ESTC a *quantum meruit* in respect of the completion of the voyage to Iran which was underway at the time the vessel was withdrawn. See Townson Decl. at ⁛ 26 and Exhibit "7" annexed thereto. Pursuant to the parties' agreement that a *quantum meruit* would be payable by TRC in respect of the balance of the voyage, the vessel proceeded to and discharged her cargo at Bandar Imam Khomeini, Iran before departing on August 3, 2007, and dropping the outward sea pilot at 1830 UTC the same day. The *quantum meruit* is therefore payable in respect of the period from withdrawal – 2320 on July 3, 2007 – to completion of the voyage which was then underway – 1830 on August 3, 2007 – which equates to 30 days, 19 hours and 10 minutes (or 30.798611 days). See Townson Decl. at ⁛ 28 and Exhibit "7" annexed thereto. See OGI Oceangate Transp. Co. v. RP Logistics Pvt. Ltd., 2007 U.S. Dist. LEXIS 46841 (S.D.N.Y. 2007)(denying plaintiff's request for security for damages due to a prior agreement executed between the parties).

Taking the market rate of $28,500 per day as the amount properly payable by TRC by way of *quantum meruit* in respect of the service provided by ESTC, then TRC is liable to ESTC for $877,760.42. See Townson Decl. at ¶ 29.

The *quantum meruit* payable by TRC to ESTC is the subject of a counterclaim in respect of which it seeks countersecurity from TRC. See infra Point V. ESTC notes from recent correspondence received from TRC's lawyers that TRC contends that the *quantum meruit* is not payable because TRC's agreement to make that payment was "*without prejudice*." See Townson Decl. at ¶ 30 This is both disingenuous and a distortion. Id. The agreement was "*without prejudice*" as to TRC's right to argue that the Vessel should not have been withdrawn; it did not make the agreement in any way conditional, and the *quantum meruit* claim is payable. Id.

In view of the above, and assuming *arguendo* that the sum claimed in respect of TRC's English solicitor's fees is reasonable, then TRC's alleged loss is no more than $1,324,804.71 (*i.e.* $1,380,000 plus $125,000 plus $697,565.13 less $877,760.42, less any earnings not disclosed to the Court), rather than $4,946,170.13. See Townson Decl. at ¶ 31. ESTC's primary case is that the Order should be vacated as inequitable and unnecessary. If, however, the Court determines not to vacate, the Order should be reduced to a level not to exceed $1,324,804.71.

### POINT V

### IF THE COURT DECLINES TO VACATE THE ATTACHMENT, THE PLAINTIFF SHOULD BE ORDERED TO POST COUNTERSECURITY FOR DEFENDANT'S COUNTERCLAIM PURSUANT TO ADMIRALTY RULE E(7)(a)

In the alternative, ESTC is entitled to countersecurity from TRC in the amount of $474,020.67 pursuant to Supplemental Admiralty Rule (7)(a) that states:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court, for cause

22

shown, directs otherwise. Proceedings on the original claim must be stayed until this security is given, unless the court direct otherwise.

Id. In Result Shipping Co. v. Ferruzzi Trading USA, Inc., 56 F.3d 394, 399 (2d Cir. 1995), the Court held that the purpose of the Rule is "to place the parties on an equality as regards security." Id. at 399-400 citing Titan Navigation Inc. v. Timsco, Inc., 808 F. 2d 400, 403 (5th Cir. 1987) (quoting Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co., 263 U.S. 629,638-39 (1924)). Countersecurity is appropriate when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction, especially when the counterclaimant could have proceeded *in rem or quasi in rem* in an independent suit. Id. Consistent with Result Shipping, courts have routinely held that Rule E (7) entitles a defendant to countersecurity. See e.g. Clipper Shipping Lines, Ltd. v. Global Transporte Oceanico S.A., 2007 U.S. Dist. LEXIS 18827 *4 (S.D.N.Y. 2007); Finecom Shipping Ltd. v. Multi Trade Enterprises AG, 2005 U.S. Dist. LEXIS 25761 *2 (S.D.N.Y. 2005); Ythan Limited v. Americas Bulk Transport Limited, 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004).

In this case, ESTC's request for countersecurity should be granted because the counterclaim arises out of the same transaction and occurrence as alleged in the Verified Complaint. Given TRC's failure to pay the *quantum meruit* due to ESTC, see supra Point IV, ESTC has asserted a counterclaim in the amount of $1,171,585.80. ESTC currently holds the sum of $697,565.13, *i.e.*, hire paid late by TRC, after ESTC's right to withdraw had accrued. See Townson Decl. at ¶ 34. As ESTC's counterclaim is already secured to the extent of $697,565.13, it is undersecured to the extent of $474,020.67.

23

## CONCLUSION

For the foregoing reasons, the Court should vacate the Ex Parte Attachment Order pursuant

to Admiralty Rule E(4)(f). In the alternative, the Court should reduce the Order pursuant to

Admiralty Rule E(6) from $4,946,170.13 to $1,324,804.71 and also order the posting of

countersecurity pursuant to Admiralty Rule E(7)(a) in the amount of $474,020.67.

Dated: September 17, 2007
New York, NY

Respectfully submitted,

The Defendant,
EXPRESS SEA TRANSPORT CORPORATION,

By:

Charles E. Murphy (CM 2125)
Patrick F. Lennon (PL 2162)
LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 (phone)
(212) 490-6070 (fax)
cem@lenmur.com
pfl@lenmur.com

## AFFIRMATION OF SERVICE

I hereby certify that on September 17, 2007, a copy of the foregoing Memorandum of Law

was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing. Parties may access this filing through the

Court's CM/ECF system.

By:

Charles E. Murphy

24