Keith B. Dalen (KD-4997)
Christopher M. Panagos (CP-2199)
HILL RIVKINS & HAYDEN LLP
45 Broadway, Suite 1500
New York, New York 10006
Tel: (212) 669-0600
Fax: (212) 669-0699

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| THE RICE COMPANY, | : |
| | : Index No.: 07 Civ. 7077 (WHP) |
| Plaintiff, | : |
| | : **DECLARATION OF DIEGO GARAT** |
| vs. | : |
| | : |
| EXPRESS SEA TRANSPORT CORPORATION, | : |
| | : |
| Defendant. | : |

---

DIEGO GARAT, declares under penalty of perjury under the laws of the United States as follows:

1. I am the Traffic & Risk Manager for The Rice Company (hereinafter "TRC"), the plaintiff in the above-captioned matter and make this declaration in support of plaintiff's opposition to defendant's Motion to Vacate or Reduce Maritime Attachment in the instant matter. My duties for TRC include the chartering of vessels. During the time I have worked for TRC, I have participated in the chartering of a minimum of 650 vessels and have a good knowledge of the market rates charged for the charter of vessels to transport TRC's cargoes. Prior to my employment with TRC which began in 2004, I worked for Allied Maritime in Buenos Aires as Managing Director for nine years. During that time I was involved in over a thousand charter parties.

2.      TRC is an international trader in food grains and other commodities. In furtherance of its business, TRC charters approximately 200 vessels per year to transport cargoes of grain that it has sold to purchasers throughout the world. TRC enters into charter parties for single voyages and time charters for varying lengths which encompass several voyages. As is normal in the trading business, there are times when TRC has no cargo to be moved. So as to avoid the incurrence of charter hire TRC regularly sub-charters its vessels to third parties to transport their goods.

3.      On April 4, 2007, TRC entered into a time charter with defendant, Express Sea Transport Corp. (hereinafter "ESTC") for the M/V APOSTOLOS II. To the present and since May 2006 the market rate for charter hire has been consistently going up.

4.      On the second voyage of the M/V APOSTOLOS II, under TRC's time charter, TRC sub-chartered the vessel to Helena Chartering which, in turn, sub-chartered the vessel to a company known as Bulk-Handling, a Norwegian based company with offices in Singapore. Bulk-Handling, in turn, sub-chartered the vessel to BHP-Billiton, a multinational company located in Melbourne, Australia with offices located throughout the world, including the United States. BHP-Billiton loaded a cargo of Australian alumina in bulk at the Australian port of Bunbury and ordered the vessel to the port of Bandar Imam Khomeini, Iran where it discharged from July 19 through August 3, 2007. While TRC became aware of the instructions from BHP-Billiton ordering the ship to Iran it could not contractually prevent the vessel from going to that country, nor did it believe that its

involvement violated Executive Order 13059 nor the previous Executive Orders issued with respect to trade with Iran. Notwithstanding this, TRC has advised the Office of Foreign Assets Control of the situation.

5. A short time into the charter of the M/V APOSTOLOS II, on July 3, 2007, the vessel owner canceled the charter asserting that TRC had failed to timely pay the charter hire. In fact, this notice was received while the vessel was on her second voyage and which involved the Iran discharge. So as to permit the vessel to complete her voyage TRC was forced to negotiate a separate contract with ESTC in order to get the cargo of alumina to its final destination. TRC vigorously denies having failed to timely pay charter hire and has initiated arbitration proceedings in London as provided for in the contract. Ultimately, the decision as to the rights of the parties will be decided by the London arbitrators.

6. Upon being advised that ESTC had canceled the charter party, I investigated the charter hire market and was able to ascertain that for vessels similar to the M/V APOSTOLOS II, the charter hire rate was $36,409.00 per day. TRC's claim in arbitration is based upon this rate.

7. I have had an opportunity to review the declaration of Hugh Maxwell Townson dated September 10, 2007, and which has been submitted in support of ESTC's motion. I would like to address certain misstatements and omissions contained in the declaration. To begin with, at paragraph 20 of Mr. Townson's declaration, he states that

ESTC offered to re-charter the vessel at a daily rate of $28,500, which he asserts was the market rate for the vessel at that time. As stated above, the market rate for a vessel similar to the APOSTOLOS II was approximately $36,409.00 per day. Attached please find a report issued by Clarkson's Group a member of the Baltic Exchange which issues reports as to hire rates on time charters in certain markets. (Exhibit 1). The report sets forth the rates for "Handy" size vessels which have the following minimum specifications:

> **28,000 mt dwt self trimming single deck bulkcarrier on 9.78m ssw 169m loa 27 m beam.**
> **5 holds/5 hatches.**
> **37,523 c.um grain 35,762 c.um bale**
> **14 knots average laden/ballast on 22 mt ifo (380) no diesel at sea.**
> **4 x 30 t cranes**
> **Maximum age 15 years.**

8. The APOSTOLOS II, which falls into the "Handy" category, exceeds the minimum specifications in the following respects:

    a. It is larger, having 34,676 M/T deadweight.

    b. It has a greater capacity – 44,020 CBM.

    c. It is also newer, being approximately 4 years old.

9. Utilizing the average of the six routes in the "Handy" category - $32,604 - results in a rate of $1.16 per ton of deadweight per day ($32,604 ÷ 28,000 dwt). Multiplying this figure by the deadweight of the APOSTOLOS II would result in a charter

4

hire of $40,224.00 as of July 23, 2007 for a vessel of the size and characteristics of the M/V APOSTOLOS II.

10. Referring to the "Handy Size FFA Curve STC" (Exhibit 1) which reflects the bid and offer prices for vessels in forward agreements one can observe that the average daily charter hire for the third and fourth quarters of 2007 and the first and second quarters of 2008 was $31,250 per day or $1.05 per deadweight ton per day. Thus, multiplying that amount by the deadweight of the M/V APOSTOLOS II results in a daily hire rate of $36,409. In presenting the claim to ESTC, I conservatively chose the lower rate of $36,409 instead of the rate in existence at the time of $40,224.00. In accord with my experience, this rate accurately represents the market rate for a vessel such as the M/V APOSTOLOS II for the period remaining on the charter party after cancellation by ESTC.

11. Mr. Townson's statement that he offered TRC the APOSTOLOS II at a daily rate of $28,500.00 omits certain significant facts which call into question the accuracy of the statement. To begin with, on July 11, 2007, ESTC, through its agents, offered to re-charter the vessel at a rate of $28,500 per day "...subject to a minor revision of the hire payment details to clarify charterers' payment obligations for the purpose of avoiding a recurrence of the issues which resulted in the withdrawal of the vessel under the 04/04/07 charter, and the previous instances of late payment." (Exhibit 2). The sole purpose, as stated by ESTC, for making this offer was "for the purpose of ensuring a cap on any damages you may sustain." (Exhibit 2).

5

12. On July 13, 2007, TRC's attorney orally made a without prejudice counter offer which attempted to find some middle ground but still protect TRC's claim.

13. On July 13, 2007, ESTC responded rejecting the counteroffer, and made the following offer:

> "To show their good will ESTC are willing to repeat their offer of yesterday i.e. $28,500 **under the same terms as the previous C/P etc**. for acceptance by C.O.B. USA West Coast today 13th July. In the event that this offer is declined, ESTC reserves the right to refer to it openly as being relevant to the recovery of any damages that the Charterers have threatened to pursue." (Emphasis supplied)

(Exhibit 3)

14. On the same day, Friday, July 13, 2007, I responded to the offer by ESTC by reluctantly but unconditionally accepting ESTC's terms. (Exhibit 3). I then followed up on Monday, July 16, 2007, asking for confirmation from the Master of the M/V APOSTOLOS II that the vessel remained under charter to TRC. (Exhibit 3).

15. The next communication from ESTC was from its lawyers – after several requests for confirmation of the new charter from TRC's attorneys – on July 17, 2007 indicating that ESTC's response would be received shortly (Exhibit 4). What is significant in this communication from Mr. Charles Weller, ESTC's attorney, was his statement that "...TRC recapitulation of ESTC's proposal was silent as to the required revision of clause

6

30." (Exhibit 4 – e-mail of 17 July 2007, 14:20). In fact, the offer to which I responded and accepted makes no mention of the revision of clause 30 (Exhibit 3). Indeed, the offer opens with a statement that ESTC intended to show its good faith and specifically states that all the terms of the charter party remained in effect.

16.   The next correspondence from ESTC was on July 17, 2007 (Exhibit 5). In that e-mail, ESTC backtracked on its offer of July 13, 2007 and resurrected its demand that clause 30 of the charter party "...be subject to minor revision (Exhibit 2). In fact, the revision proposed by ESTC was substantial and, in effect, called for the elimination of clause 31, the anti-technicality clause, of the charter party, which will be the subject of much discussion in the London arbitration as it bears directly on the right of ESTC to cancel the charter.

17.   On July 17, 2007, TRC demanded arbitration and appointed its arbitrator. (Exhibit 6).

18.   On the following day, July 18, 2007, TRC's attorney responded in detail to ESTC's offer of 17 July 2007 (Exhibit 7).

19.   Without going into detail, there were additional communications between the attorneys for TRC and ESTC regarding the effect of rewriting clause 30 (Exhibit 8). The upshot was that ESTC withdrew its offer to charter the M/V APOSTOLOS II for

7

$28,500 per day on July 20, 2007 (Exhibit 9).

20.     Another area in which Mr. Townson's declaration fails to fully apprise the court of the full facts involves the issue of the security. Mr. Townson is correct that a communication was received from ESTC's attorneys (Exhibit 1 to Townson declaration) concerning the posting of an LOU by ESTC. However, it was my view that the offer to post an LOU – merely a promise to pay – could in no way be considered security for TRC's claims and was a sham offer intended solely to buttress ESTC's tactical position should TRC move to attach ESTC's assets. My opinion is supported by the statement on page 2 of Exhibit 2 where ESTC mentions that its "'in principle' willingness to offer security" must be mentioned to the court. This is further parroted in the e-mail of July 24, 2007 (Townson, Exhibit 1) where ESTC's attorney reserves the right to refer to the proposals "as may be necessary."

21.     It was only on August 28, 2007, after the Order of Attachment was signed by the court, that ESTC's attorneys offered to post security, provided that TRC pay for the cost of same (Townson, Exhibit 3, page 2) in the following language:

> "If TRC are adamant that it is absolutely necessary to have urgent security for their claim in the form of a bank guarantee, then ESTC are content to provide the same forthwith against TRC undertaking to answer for the costs of the same from the date of establishing it until the date of payment of an adverse award or settlement or until the date of either party filing an application to appeal the award."

22. The above offer, coming as it did after the Order of Attachment had been issued by the court, was unacceptable as it placed on TRC the burden of paying for the guarantee used to secure its claim against ESTC for its wrongful cancellation of the charter party.

23. Mr. Townson has failed to provide the court with two communications from TRC's attorneys dated August 30, 2007 and September 5, 2007 (Exhibit 10) inquiring if ESTC was prepared to post a bank guarantee without the condition that TRC pay for same.

24. As it now stands, ESTC has neither posted adequate security to secure TRC's claim in the London arbitration nor has it offered to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 25, 2007

_____
DIEGO GARAT

9