### James King

| | |
|---|---|
| From: | Weller, Charles G. [CWeller@ReedSmith.com] |
| Sent: | 18 July 2007 19:29 |
| To: | James King |
| Cc: | Enston, Matthew B. |
| Subject: | "Apostolos II" C/P dd 04.04.07 - WITHOUT PREJUDICE |

We have received your faxes dated 17 and 18 July.

With regard to the first fax, comprising the arbitration notice, the appointment of TRC's arbitrator is noted. However, ESTC are not obliged to appoint an arbitrator within 7 clear days of yesterday's notice, and they shall give notice of their appointment at the appropriate time.

As for your fax today, which appears to have abandoned the "WP" rubric of your previous correspondence concerning the post-withdrawal negotiations, the Owners' proposals are commercial and should be dealt with between principals. However, since TRC apparently refuse to negotiate through commercial channels, and if communications are to be had with TRC through you, then we are instructed to ask that, for convenience, you be kind enough to communicate by e-mail. Beyond that, our clients are obviously concerned about conducting discussions with Charterers through their solicitors, particularly in circumstances in which you have alleged that it is debatable whether ESTC's WP offer for fresh charter terms required a revision of clause 30 (see 4 below).

Otherwise, under the "Without Prejudice" heading above, ESTC deal with your numbered paragraphs in turn

1.  It is of little interest to ESTC how the funds arrive in their bank. Their bank is in Piraeus and that is where they require funds on or before the due date. With clause 30 as it was drafted, Charterers through you have asserted that payment to an intermediary bank is somehow to be equated with a payment to the Owners. Our clients had not unreasonably thought that the words: *"paid to owners, bank account details below" "Bank details: Alpha Bank ... Piraeus"* would have been adequate, but you have vigorously asserted that mere payment to a correspondent bank is enough.

You appear to be suggesting that it is unusual for a C/P to provide that US dollar hire payments are to be made to a non US banks. It is not. It is unexceptional for a C/P to detail the receiving account, and the onus then remains upon the charterer to route the money, through the correct intermediary or correspondent banks, in time to that account. There is no obligation on the owners to identify the correct intermediary, so making good that payment to an owners' bank account is not, under the contract, out of the charterers' control and remains their responsibility.

In its original form, after setting out the Owners' bank details, clause 30 helpfully identified, as a fact, Citibank as the intermediary bank for the payment of US dollars to Alpha Bank. Since the Charterers have tried to argue that they have discharged their payment obligations merely by paying money to the intermediary bank, and given TRC's history of late payments, it makes sense that the reference to the intermediary bank is deleted from clause 30, as the Owners have proposed.

2.  This illustrates precisely the problem which ESTC perceive in TRC's conduct. You write as though the obligation to provide invoices is established in the clause as one which is on-going. As it appears in the clause the provision cannot, as a matter of simple English, be reasonably read as more than a singular obligation in relation to the first hire payment. It is precisely because ESTC imagined that in particular circumstances TRC might argue, by analogy with their arguments in relation to the effectiveness of withdrawal notices, that Owners' conduct was deficient through not providing timely invoices, that they require this change. The obligation on Charterers is to pay hire by the due date. The Charterers are best placed to schedule and route these payments. That is not to say that ESTC will not provide invoices in the future, but they are not prepared to have a courtesy turned into a stick with which to beat them or trip them up.

19/09/2007

Case 1:07-cv-07077-WHP Document 15-9 Filed 09/25/2007 Page 2 of 15

3. Clause 31 contained no anti-technicality provision. It contained a certain requirement for notice in the event that hire was not paid on time. Incidentally, contrary to your previous allegation, it contained no requirement that any notice be spelt out as an ultimatum before withdrawal or that it refer to clause 31. It simply obliged the Owners to give notice in the event the hire was paid late, and for the Owners to accept a late payment if made within 3 banking days.

In any event we do not see that what the Owners are now proposing is in any way unreasonable or unworkable. The NYPE standard form provides for no such terms as the Charterers are demanding. ESTC are simply expecting payment of hire to be made so that it is with Owners by the due date. They are not aware of any particular reason why banks cannot confirm transmission and receipt of funds up and down the line. They can see nothing unreasonable about expecting the Charterers to have a system in place whereby they secure a confirmation of delivery of funds in due time, even if only by way of a simple inquiry to Owners' office. What they have proposed in these circumstances is a regime which gives limited but reasonable relief to the Charterers from the consequences of the unexpected.

4. On 11 July 2007 at 20:29hrs Greek time, 17:29 hrs GMT, ESTC sent the following to TRC: *"Indeed ... we would be content ...to re-offer to you the vessel at a daily rate of hire of US$28,500/day, effective immediately, for a period to min March 12th 2008, / max June 12th, 2008 with other terms as per the 04/04/07 charter (and subject to a minor revision of the hire payment details to clarify charterers' payment obligations for the purpose of avoiding a recurrence of the issues which resulted in the withdrawal of the vessel under the 04/04/07 charter, and the previous instances of late payment)"*. Our clients are now simply clarifying what the term *"effective immediately"* meant, means and will continue to mean.

As for the LoI, since no new C/P has yet been fixed, the Owners are not obliged to accept anything other than the presentation of original bills of lading to effect delivery of the cargo. ESTC e-mailed TRC this morning with proposals for the acceptance of a LoI. ESTC have yet to hear back on that. ESTC have, however, in consultation with the ship's registered owners, ordered the Master to stop and wait off BIK pending an agreement either with TRC as to the new C/P (the current discussions related to the above) and the LoI, or with the merchant, either through Bulkhandling A/S or direct, as to an alternative LoI - or until the original bills of lading are available.

As regards the issue of the *quantum meruit* mentioned, if agreement is reached on the new clause 30 and the offer concerning the replacement C/P is accepted clean, so that the *quantum meruit* stands in respect of the period from withdrawal to 11 July 2007 17:29 GMT, then this will further require confirmation that no assertion will be made as to off-hire or the like for the period from that date/time through to departure BIK under the new charterparty in the absence of a completely fresh incident which would (in the ordinary course of events) trigger the off-hire provisions.

We look forward to hearing from you.

Regards

**Charles Weller**
**Partner**
**Shipping Group**
Reed Smith Richards Butler LLP
Direct line +44 (0) 20 7772 5771
Direct fax + 44 (0) 20 7539 5112
Mobile + 44 (0) 7710 082 173
Beaufort House
15 St. Botolph Street
London EC3A 7EE
T: +44 (0) 20 7247 6555
F +44 (0) 20 7247 5091
www.reedsmith.com

19/09/2007

Reed Smith Richards Butler LLP is a limited liability partnership registered in England (registered no. OC303620) with its registered office at Beaufort House, Tenth Floor, 15 St. Botolph Street, London EC3A 7EE, England. Reed Smith Richards Butler LLP is regulated by the Law Society.

A list of members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. Any reference in this email to a partner of Reed Smith Richards Butler LLP is to a person who is a member of Reed Smith Richards Butler LLP or to an employee of equivalent standing. Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA.

This e-mail is confidential and may be protected by legal privilege. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation. Please contact us on **+44 (0) 20 7247 6555** if you need assistance.

Disclaimer Version RS.UK.1.01.03

19/09/2007

# James King

| | |
|---|---|
| From: | James King |
| Sent: | 19 July 2007 14:28 |
| To: | 'Weller, Charles G.' |
| Cc: | Enston, Matthew B. |
| Subject: | RE: "Apostolos II" C/P dd 04.04.07 - WITHOUT PREJUDICE |

Thank you for your e-mail yesterday.

Your comments regarding Owners' appointment of an Arbitrator are rather unclear. Of course Owners are not obliged to appoint their arbitrator within 7 clear days of the arbitration notice, but if they fail to do so, then we will be entitled to appoint Mr Gaisford as sole arbitrator. If you disagree, please explain why, with reference to clause 73.

As to the substantive issues, we understand that our respective Clients have come to a without prejudice arrangement regarding the LOI and discharge of the cargo. Turning to the charter negotiations, we would comment as follows:

1. We were not suggesting that it is unusual for a charter to provide that US Dollar funds be remitted to a non-US bank. What we do understand to be the position, however, and on which you have not dissented, is that such payments must always be routed via banks located in the US. It is therefore important for the receiving party to specify the US intermediary of his non-US bank in order to receive funds; there is no other way to make payment. No doubt that is precisely why clause 30 of the charter gives this information.

    Please confirm for the sake of good order that Citibank, whose details were given in clause 30, remain the intermediary for Alpha Bank. If they are, what is the problem with confirming that fact in the charter?

    In any event, given that payment must be made via an intermediary bank, do you or Owners have any practical proposals to resolve this issue over direct payment?

2. It is denied that the requirement to provide invoices only applies for the first hire payment. However, we have already explained to you that our Clients cannot make any payments, due to US regulatory requirements, without an invoice. Please explain why your Clients are unable to provide, once every 15 days, a simple invoice for hire, as they have done for every hire payment since the charter commenced. If they are able to provide invoices, please confirm that they will do so in advance of the hire payments. This is necessary in order for our Clients to actually make payment.

3. The argument that clause 31 does not contain an anti-technicality provision is of course incorrect. The Courts have interpreted clauses such as clause 31 as requiring that notices given under them contain an ultimatum that withdrawal will take place unless the outstanding hire is remitted within the grace period. The notice must be clear and absolute in terms; see, for example, *The Li Hai*.

    We should in any event point out that it is not our Clients who are *"demanding"* terms. Clause 31 had already been agreed between the parties; our Clients simply require that Owners stick to their agreement. While the NYPE 1946 Form does not contain an anti-technicality clause, such as clause 31, as standard, that is irrelevant; we both know that such clauses are almost invariably inserted into NYPE 1946 charters, and the NYPE 1993 Form does contain it as standard.

    The fact that Owners' proposal in this regard is unworkable is obvious. Our Clients are allowed up to midnight on the due date to pay hire; can Owners guarantee that someone will be at Owners' offices at 11:59pm on every single due date to allow our Clients to check safe receipt?

    Accordingly, our Clients have confirmed to us that the anti-technicality provision contained in clause 31 must stand; however, in an effort to allay Owners' concerns, our Clients have confirmed that they would be prepared to agree to an amendment to clause 31, such that our Clients are only entitled to a limited number of grace periods for the remainder of the charter; we would suggest four such periods. Please confirm Owners' agreement to this.

    Further in this regard, and as evidence of their good will and reasonableness, our Clients would also be prepared to pay an additional 15 days' hire to Owners, on 26th July 2007, and at the rate of US$28,500 per day, to stand as a reserve or security for Owners, to be repaid to our Clients on redelivery of the vessel.

4. You have referred to the wrong offer. In their message of 13th July, Owners clearly regarded the conversation between our Mr King and your Mr Enston of that day, in which we sounded you out as to the possibility of a lump sum payment, or the additional hire to be paid into escrow, to amount to a counter-offer, following which Owners made a further offer on the same terms as previously. It is the offer made on 13th July that we are discussing. The phrase *"effective immediately"*

19/09/2007

can only apply to that offer, and cannot be backdated.

We are not sure that your reference to *quantum meruit* now requires any comment, given that the parties have agreed without prejudice terms on this.

We look forward to hearing from you.

Kind Regards

James King
Winter Scott Solicitors
St Olave's House
Ironmonger Lane
London
EC2V 8EY
Tel: +44 (0)20 7367 8989
Fax: +44 (0)20 7726 2371

IMPORTANT: This e-mail is intended only for the addressee. It may contain privileged and/or confidential information. If you are not the intended recipient, please inform us by telephone on +44 (0)20 7367 8989 and return the original to us by post.

---

**From:** Weller, Charles G. [mailto:CWeller@ReedSmith.com]
**Sent:** 18 July 2007 19:29
**To:** James King
**Cc:** Enston, Matthew B.
**Subject:** "Apostolos II" C/P dd 04.04.07 - WITHOUT PREJUDICE

We have received your faxes dated 17 and 18 July.

With regard to the first fax, comprising the arbitration notice, the appointment of TRC's arbitrator is noted. However, ESTC are not obliged to appoint an arbitrator within 7 clear days of yesterday's notice, and they shall give notice of their appointment at the appropriate time.

As for your fax today, which appears to have abandoned the "WP" rubric of your previous correspondence concerning the post-withdrawal negotiations, the Owners' proposals are commercial and should be dealt with between principals. However, since TRC apparently refuse to negotiate through commercial channels, and if communications are to be had with TRC through you, then we are instructed to ask that, for convenience, you be kind enough to communicate by e-mail. Beyond that, our clients are obviously concerned about conducting discussions with Charterers through their solicitors, particularly in circumstances in which you have alleged that it is debatable whether ESTC's WP offer for fresh charter terms required a revision of clause 30 (see 4 below).

Otherwise, under the "Without Prejudice" heading above, ESTC deal with your numbered paragraphs in turn

1.  It is of little interest to ESTC how the funds arrive in their bank. Their bank is in Piraeus and that is where they require funds on or before the due date. With clause 30 as it was drafted, Charterers through you have asserted that payment to an intermediary bank is somehow to be equated with a payment to the Owners. Our clients had not unreasonably thought that the words: *"paid to owners, bank account details below" "Bank details: Alpha Bank ... Piraeus"* would have been adequate, but you have vigorously asserted that mere payment to a correspondent bank is enough.

You appear to be suggesting that it is unusual for a C/P to provide that US dollar hire payments are to be made to a non US banks. It is not. It is unexceptional for a C/P to detail the receiving account, and the onus then remains upon the charterer to route the money, through the correct intermediary or correspondent banks, in time to that account. There is no obligation on the owners to identify the correct intermediary, so making good that payment to an owners' bank account is not, under the contract, out of the charterers' control and remains their responsibility.

19/09/2007

In its original form, after setting out the Owners' bank details, clause 30 helpfully identified, as a fact, Citibank as the intermediary bank for the payment of US dollars to Alpha Bank. Since the Charterers have tried to argue that they have discharged their payment obligations merely by paying money to the intermediary bank, and given TRC's history of late payments, it makes sense that the reference to the intermediary bank is deleted from clause 30, as the Owners have proposed.

2. This illustrates precisely the problem which ESTC perceive in TRC's conduct. You write as though the obligation to provide invoices is established in the clause as one which is on-going. As it appears in the clause the provision cannot, as a matter of simple English, be reasonably read as more than a singular obligation in relation to the first hire payment. It is precisely because ESTC imagined that in particular circumstances TRC might argue, by analogy with their arguments in relation to the effectiveness of withdrawal notices, that Owners' conduct was deficient through not providing timely invoices, that they require this change. The obligation on Charterers is to pay hire by the due date. The Charterers are best placed to schedule and route these payments. That is not to say that ESTC will not provide invoices in the future, but they are not prepared to have a courtesy turned into a stick with which to beat them or trip them up.

3. Clause 31 contained no anti-technicality provision. It contained a certain requirement for notice in the event that hire was not paid on time. Incidentally, contrary to your previous allegation, it contained no requirement that any notice be spelt out as an ultimatum before withdrawal or that it refer to clause 31. It simply obliged the Owners to give notice in the event the hire was paid late, and for the Owners to accept a late payment if made within 3 banking days.

In any event we do not see that what the Owners are now proposing is in any way unreasonable or unworkable. The NYPE standard form provides for no such terms as the Charterers are demanding. ESTC are simply expecting payment of hire to be made so that it is with Owners by the due date. They are not aware of any particular reason why banks cannot confirm transmission and receipt of funds up and down the line. They can see nothing unreasonable about expecting the Charterers to have a system in place whereby they secure a confirmation of delivery of funds in due time, even if only by way of a simple inquiry to Owners' office. What they have proposed in these circumstances is a regime which gives limited but reasonable relief to the Charterers from the consequences of the unexpected.

4. On 11 July 2007 at 20:29hrs Greek time, 17:29 hrs GMT, ESTC sent the following to TRC: *"Indeed ... we would be content ...to re-offer to you the vessel at a daily rate of hire of US$28,500/day, effective immediately, for a period to min March 12th 2008, / max June 12th, 2008 with other terms as per the 04/04/07 charter (and subject to a minor revision of the hire payment details to clarify charterers' payment obligations for the purpose of avoiding a recurrence of the issues which resulted in the withdrawal of the vessel under the 04/04/07 charter, and the previous instances of late payment)"*. Our clients are now simply clarifying what the term *"effective immediately"* meant, means and will continue to mean.

As for the LoI, since no new C/P has yet been fixed, the Owners are not obliged to accept anything other than the presentation of original bills of lading to effect delivery of the cargo. ESTC e-mailed TRC this morning with proposals for the acceptance of a LoI. ESTC have yet to hear back on that. ESTC have, however, in consultation with the ship's registered owners, ordered the Master to stop and wait off BIK pending an agreement either with TRC as to the new C/P (the current discussions related to the above) and the LoI, or with the merchant, either through Bulkhandling A/S or direct, as to an alternative LoI - or until the original bills of lading are available.

As regards the issue of the *quantum meruit* mentioned, if agreement is reached on the new clause 30 and the offer concerning the replacement C/P is accepted clean, so that the *quantum meruit* stands in respect of the period from withdrawal to 11 July 2007 17:29 GMT, then this will further require confirmation that no assertion will be made as to off-hire or the like for the period from that date/time through to departure BIK under the new charterparty in the absence of a completely fresh incident which would (in the ordinary course of events) trigger the off-hire provisions.

We look forward to hearing from you.

19/09/2007

Regards

**Charles Weller**
**Partner**
**Shipping Group**
Reed Smith Richards Butler LLP
Direct line +44 (0) 20 7772 5771
Direct fax + 44 (0) 20 7539 5112
Mobile + 44 (0) 7710 082 173
Beaufort House
15 St. Botolph Street
London EC3A 7EE
T +44 (0) 20 7247 6555
F +44 (0) 20 7247 5091
www.reedsmith.com

Reed Smith Richards Butler LLP is a limited liability partnership registered in England (registered no. OC303620) with its registered office at Beaufort House, Tenth Floor, 15 St. Botolph Street, London EC3A 7EE, England. Reed Smith Richards Butler LLP is regulated by the Law Society.

A list of members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. Any reference in this email to a partner of Reed Smith Richards Butler LLP is to a person who is a member of Reed Smith Richards Butler LLP or to an employee of equivalent standing. Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA.

This e-mail is confidential and may be protected by legal privilege. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation. Please contact us on **+44 (0) 20 7247 6555** if you need assistance.

Disclaimer Version RS.UK.1.01.03

19/09/2007

**James King**

| | |
|---|---|
| **From:** | Weller, Charles G. [CWeller@ReedSmith.com] |
| **Sent:** | 19 July 2007 20:36 |
| **To:** | James King |
| **Cc:** | Enston, Matthew B. |
| **Subject:** | "Apostolos II" - Without Prejudice |

The terms proposed in this message require TRC's clean acceptance **by noon London time tomorrow, 20 July, 2007**.

With regard to the appointment of Owners' arbitrator, you will appreciate that, as a matter of construction, the 7 clear days runs from when the party *"making default"* has received a notice. The Owners are not yet in default (and will not be), so cannot have received such a notice. In any event, we are instructed to appoint Mr Alec Kazantzis on behalf of ESTC, and shall do so shortly. ESTC are content to agree an *ad hoc* variation of the arbitration clause to that of a tribunal (three arbitrators) rather than a panel of two and an umpire, if that would be preferred by TRC.

As to the substantive issues, these shall be addressed one by one as set out by you, not least because they do involve some possible amendment of the draft clause, but they are to a large extent rendered academic by TRC's last proposal:

1. As the receiving party in the 04.04.07 charter, the Owners helpfully specified the US correspondent of their bank. Having done so, the Charterers determined to use that to their perceived advantage; making out that by providing those details (requested for the clause as drafted by the Charterers) the Owners were somehow holding out that the correspondent bank was in some way an equivalent to their bank and that payment to the correspondent was effectively payment to the Owners' own bank. Charterers thereafter made a second payment, routed in a different way, which was of their own initiative.

ESTC's redrafted clause seeks to avoid the specific argument already raised by TRC through you on the point, and is maintained as proposed by them for TRC's acceptance.

2. A 'denial' of the meaning of plain English *"1st hire ... - ... hire invoice..."* does raise questions. As TRC have confirmed, ESTC have provided an invoice for every hire payment under the 04.04.07 charter. They have not done so under the apprehension that a failure to produce an invoice by a particular date or, for example, in a particular form, might hereafter also be used as a stick to beat them with. TRC did not contract for invoices in a particular form or by a particular date or the like in the C/P. Were it so important for them then it would reasonably be expected that they would have insisted on such a term. If they need invoices to assist compliance with regulatory (governmental or domestic) protocols, then they will be provided. But ESTC will not consent to an agreement to provide invoices in particular forms or by particular dates being elevated to a position whereby it becomes a means by which the Charterers will argue a transfer of responsibility for the late payment of hire.

If TRC are content to concede the obligation for a hire invoice in advance, as a matter of plain English, refers to the 1st hire and is not a continuing obligation for all remaining hires, then we are instructed that ESTC are content (a) to incorporate the sentence beginning *"1st hire ..."* through to *"... to Charterers."* into the revised clause and (b) to continue to provide hire invoices (promptly upon request, if TRC feel that is a desirable qualification) as they have done heretofore. It must always be understood, however, that prior receipt of a particular invoice is not to be regarded as (an equivalent of) a condition precedent for the payment of a particular hire instalment.

Incidentally, the provision regarding assignment of hire was omitted from the revised clause by oversight, and it is certainly agreeable for that to be reinstated in the revised clause.

19/09/2007

3. The point you advance in relation to clause 31 adequately makes ESTC's point. ESTC do not want lawyer's arguing over the court's interpretation of clauses such as clause 31. This is a simple commercial matter. TRC's payments were regularly late into ESTC's account. On the wording of the charter ESTC perceived (and will maintain):

a) There was a failure to make a punctual and regular payment - the funds were not there, in their account at Alpha Bank, on the due date.

b) ESTC (promptly) advised of the non-receipt of the funds - by email on 27 June, and

c) The payment was not received within three banking days

and that, accordingly, they were entitled to withdraw the ship from the Charterers' service.

TRC appear content to argue that the clause does not mean what it says. They want to modify its meaning, as they perceive is permitted by judicial consideration of other clauses and (one assumes) a general perception of the usual operation of 'anti-technicality' clauses. Clause 31 bears no material similarity with the clauses in the authorities to which you refer.

Given the disputes that have arisen (and as anticipated by the subject requiring the amendment of clause 30), ESTC require a revision of the regime which more adequately preserves the entitlement they strongly believed (and will maintain) they had negotiated. This is as set out in the revised clause.

Beyond this, the idea of the 'grace period' is to accommodate the exceptional. Accordingly, the allowance of two grace periods is considered reasonable for a charter lasting about a year. As to whether these provisions stay in clause 30 and thereby make clause 31 redundant/deleted or whether they appear as a revised clause 31 is hardly material. But they are fundamental to ESTC, as indicated in the subject set out in the offer, for the purpose of avoiding a recurrence of the problems which triggered this dispute.

In short, ESTC's revision of clause 30 should stand for acceptance as drafted, save for the amendments proposed above.

Beyond this, ESTC note TRC's proposal that they pay an additional 15 days' hire to ESTC to stand as a reserve or security for Owners - perhaps more, as it were, a "payment of hire in the absence of a prompt payment of hire". This would appear to be a 'practical proposal' of the sort sought by Charterers for eliminating their risk.

Presumably, the reserve (or "security", as it is referred to), would throughout the duration stand, whenever required, as the timely payment of hire in the case of an otherwise untimely one, whereupon the untimely remittance would reinstate the reserve. Please confirm. If so, it can only reasonably be accepted and makes the remainder of Charterers' concerns about the revised clause 30 illusory. Therefore, ESTC look forward to a formal, clean, acceptance (confirming the above point on invoicing for good order) not later than 12:00 London time (BST) tomorrow, 20 July, 2007. This is required as the parties need certainty as to whether there is an agreement or not.

Beyond that, the point about the date and time of the offer is pretty much academic in the light of the agreement for the payment of the quantum meruit under the LOI agreement.

Regards

**Charles Weller**
**Partner**
**Shipping Group**
Reed Smith Richards Butler LLP


19/09/2007

Direct line +44 (0) 20 7772 5771
Direct fax + 44 (0) 20 7539 5112
Mobile + 44 (0) 7710 082 173

Beaufort House
15 St. Botolph Street
London EC3A 7EE
T: +44 (0) 20 7247 6555
F: +44 (0) 20 7247 5091
www.reedsmith.com

Reed Smith Richards Butler LLP is a limited liability partnership registered in England (registered no. OC303620) with its registered office at Beaufort House, Tenth Floor, 15 St. Botolph Street, London EC3A 7EE, England. Reed Smith Richards Butler LLP is regulated by the Law Society.

A list of members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. Any reference in this email to a partner of Reed Smith Richards Butler LLP is to a person who is a member of Reed Smith Richards Butler LLP or to an employee of equivalent standing. Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA.

This e-mail is confidential and may be protected by legal privilege. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation. Please contact us on **+44 (0) 20 7247 6555** if you need assistance.

Disclaimer Version RS.UK.1.01.03

19/09/2007

## James King

| | |
|---|---|
| **From:** | James King |
| **Sent:** | 20 July 2007 11:50 |
| **To:** | 'Weller, Charles G.' |
| **Cc:** | Enston, Matthew B. |
| **Subject:** | RE: "Apostolos II" - Without Prejudice |

Thank you for your e-mail last night.

We disagree with your interpretation of clause 72; however, we note that you will shortly be appointing Mr Kazantzis. We agree that the arbitration clause be amended to provide for three arbitrators (rather than two arbitrators and an umpire).

Dealing briefly with your comments:

1  It is incorrect that the second payment was routed a different way; it was paid from a different bank, but was routed in precisely the same way. Indeed, we understand that Alpha Bank has only one correspondent bank in New York (Citibank), and this is therefore the only way to pay Owners.

2  Our Clients simply require a document against which to pay hire; this does not need to be in any special form, or contain any specific wording, but it does need to be received by our Clients before they can pay hire. What Owners have previously sent to our Clients on every other occasion was obviously sufficient.

However, we trust that Owners fully understand that if they do not, for whatever reason, provide a particular invoice for a particular hire payment, then it will be impossible for our Clients to process that hire payment. We would suggest a small amendment to clause 30, to the effect that Owners will provide invoices to our Clients by a certain number of banking days prior to the due date. If this is acceptable to Owners, then we can check with our Clients as to the precise number of days they require. This is not an unreasonable or onerous request, given that this is what Owners have been doing all along, and is simply being made so that Owners receive hire on time.

3  Obviously we do not accept Owners' construction of clause 31, but we say no more about it at this stage.

However, our Clients are willing to agree to a revised form of clause 30, as follows:

"Clause 30
a) Hire payment
Hire and all monies due to the Owners under this charterparty (hereafter 'hire') shall be paid at their bank in Piraeus and to their account, the details of which are as below. Charterers will not agree to the assignment of hire, monies due under this Charter Party, or the Charter Party itself in any circumstances whatsoever.

b) Bank/account details
Alpha Bank AE
Piraeus Shipping Branch
89 Akti Miaouli Street
Piraeus

Tel: +30 210 429 0208
Fax: +30 210 429 0348

IBAN:  GR36 0140 9600 9600 1500 6007 550
SWIFT: CRBAGRAA
A/C NO: 960-01-500600-7550

In favour of: Express Sea Transport
Reference:   TRC - C/P 04.04.07

Correspondent bank in New York of Alpha Bank as needed for remittances in U.S. Currency:    Citibank Na, New York
SWIFT:                                                                                       CITIUS33XXX
ABA:                                                                                         021000089
Account no:                                                                                  36251442

c) First hire
The first hire shall be paid within three banking days after the vessel's delivery – Owners to provide hire invoice in advance to Charterers, such invoices to be provided by Owners to Charterers latest [xx] banking days prior to the due date.

d) Charterers will pay to Owners an additional 15 days hire ("the reserve"), with this reserve to be treated as automatically standing in the place of any late hire payment, such that, if Owners do not receive any hire payment by the due date, they will be entitled to treat and keep the reserve as timely payment of that hire payment. The next hire payment made by Charterers will be then treated as automatically reinstating this reserve. Owners expressly agree that the reserve is only be used to stand in the place of late hire payments; it is not to be treated or otherwise retained by Owners as security or part security for any other claim whatsoever that Owners may have against Charterers. On redelivery, any balance remaining by way of reserve is to be immediately returned to Charterers."

As you will see, we have deleted the grace period provision (and thus clause 31 can also be deleted), as the provision for a retainer for any late hire payment, which Owners can automatically keep if any hire is late, with the retainer to be automatically reinstated once the late hire is received, should remove any need for grace periods/anti-technicality notices. This eliminates any difficulties over the wording.

We also need to give some thought to the bunker position (as per clause 43). We would suggest that our Clients take over the bunkers on board following delivery back to them, with no payment by way of bunkers on board on delivery being made.

Kind Regards

James King
Winter Scott Solicitors
St Olave's House
Ironmonger Lane
London
EC2V 8EY
Tel: +44 (0)20 7367 8989
Fax: +44 (0)20 7726 2371

IMPORTANT: This e-mail is intended only for the addressee. It may contain privileged and/or confidential information. If you are not the intended recipient, please inform us by telephone on +44 (0)20 7367 8989 and return the original to us by post.

---

**From:** Weller, Charles G. [mailto:CWeller@ReedSmith.com]
**Sent:** 19 July 2007 20:36
**To:** James King
**Cc:** Enston, Matthew B.
**Subject:** "Apostolos II" - Without Prejudice

The terms proposed in this message require TRC's clean acceptance **by noon London time tomorrow, 20 July, 2007**.

With regard to the appointment of Owners' arbitrator, you will appreciate that, as a matter of construction, the 7 clear days runs from when the party *"making default"* has received a notice. The Owners are not yet in default (and will not be), so cannot have received such a notice. In any event, we are instructed to appoint Mr Alec Kazantzis on behalf of ESTC, and shall do so shortly. ESTC are content to agree an *ad hoc* variation of the arbitration clause to that of a tribunal (three arbitrators) rather than a panel of two and an umpire, if that would be preferred by TRC.

As to the substantive issues, these shall be addressed one by one as set out by you, not least because they do involve some possible amendment of the draft clause, but they are to a large extent rendered academic by TRC's last proposal:

1. As the receiving party in the 04.04.07 charter, the Owners helpfully specified the US correspondent of their

19/09/2007

bank. Having done so, the Charterers determined to use that to their perceived advantage; making out that by providing those details (requested for the clause as drafted by the Charterers) the Owners were somehow holding out that the correspondent bank was in some way an equivalent to their bank and that payment to the correspondent was effectively payment to the Owners' own bank. Charterers thereafter made a second payment, routed in a different way, which was of their own initiative.

ESTC's redrafted clause seeks to avoid the specific argument already raised by TRC through you on the point, and is maintained as proposed by them for TRC's acceptance.

2. A 'denial' of the meaning of plain English *"1st hire ... - ... hire invoice..."* does raise questions. As TRC have confirmed, ESTC have provided an invoice for every hire payment under the 04.04.07 charter. They have not done so under the apprehension that a failure to produce an invoice by a particular date or, for example, in a particular form, might hereafter also be used as a stick to beat them with. TRC did not contract for invoices in a particular form or by a particular date or the like in the C/P. Were it so important for them then it would reasonably be expected that they would have insisted on such a term. If they need invoices to assist compliance with regulatory (governmental or domestic) protocols, then they will be provided. But ESTC will not consent to an agreement to provide invoices in particular forms or by particular dates being elevated to a position whereby it becomes a means by which the Charterers will argue a transfer of responsibility for the late payment of hire.

If TRC are content to concede the obligation for a hire invoice in advance, as a matter of plain English, refers to the 1st hire and is not a continuing obligation for all remaining hires, then we are instructed that ESTC are content (a) to incorporate the sentence beginning *"1st hire ..."* through to *"... to Charterers."* into the revised clause and (b) to continue to provide hire invoices (promptly upon request, if TRC feel that is a desirable qualification) as they have done heretofore. It must always be understood, however, that prior receipt of a particular invoice is not to be regarded as (an equivalent of) a condition precedent for the payment of a particular hire instalment.

Incidentally, the provision regarding assignment of hire was omitted from the revised clause by oversight, and it is certainly agreeable for that to be reinstated in the revised clause.

3. The point you advance in relation to clause 31 adequately makes ESTC's point. ESTC do not want lawyer's arguing over the court's interpretation of clauses such as clause 31. This is a simple commercial matter. TRC's payments were regularly late into ESTC's account. On the wording of the charter ESTC perceived (and will maintain):

a) There was a failure to make a punctual and regular payment - the funds were not there, in their account at Alpha Bank, on the due date.

b) ESTC (promptly) advised of the non-receipt of the funds - by email on 27 June, and

c) The payment was not received within three banking days

and that, accordingly, they were entitled to withdraw the ship from the Charterers' service.

TRC appear content to argue that the clause does not mean what it says. They want to modify its meaning, as they perceive is permitted by judicial consideration of other clauses and (one assumes) a general perception of the usual operation of 'anti-technicality' clauses. Clause 31 bears no material similarity with the clauses in the authorities to which you refer.

Given the disputes that have arisen (and as anticipated by the subject requiring the amendment of clause 30), ESTC require a revision of the regime which more adequately preserves the entitlement they strongly believed (and will maintain) they had negotiated. This is as set out in the revised clause.

Beyond this, the idea of the 'grace period' is to accommodate the exceptional. Accordingly, the allowance of two grace periods is considered reasonable for a charter lasting about a year. As to whether these provisions stay in

19/09/2007

clause 30 and thereby make clause 31 redundant/deleted or whether they appear as a revised clause 31 is hardly material. But they are fundamental to ESTC, as indicated in the subject set out in the offer, for the purpose of avoiding a recurrence of the problems which triggered this dispute.

In short, ESTC's revision of clause 30 should stand for acceptance as drafted, save for the amendments proposed above.

Beyond this, ESTC note TRC's proposal that they pay an additional 15 days' hire to ESTC to stand as a reserve or security for Owners - perhaps more, as it were, a "payment of hire in the absence of a prompt payment of hire". This would appear to be a 'practical proposal' of the sort sought by Charterers for eliminating their risk.

Presumably, the reserve (or "security", as it is referred to), would throughout the duration stand, whenever required, as the timely payment of hire in the case of an otherwise untimely one, whereupon the untimely remittance would reinstate the reserve. Please confirm. If so, it can only reasonably be accepted and makes the remainder of Charterers' concerns about the revised clause 30 illusory. Therefore, ESTC look forward to a formal, clean, acceptance (confirming the above point on invoicing for good order) not later than 12:00 London time (BST) tomorrow, 20 July, 2007. This is required as the parties need certainty as to whether there is an agreement or not.

Beyond that, the point about the date and time of the offer is pretty much academic in the light of the agreement for the payment of the quantum meruit under the LOI agreement.

Regards


**Charles Weller**
**Partner**
**Shipping Group**
Reed Smith Richards Butler LLP
Direct line +44 (0) 20 7772 5771
Direct fax + 44 (0) 20 7539 5112
Mobile + 44 (0) 7710 082 173


Beaufort House
15 St. Botolph Street
London EC3A 7EE
T: +44 (0) 20 7247 6555
F: +44 (0) 20 7247 5091
www.reedsmith.com

Reed Smith Richards Butler LLP is a limited liability partnership registered in England (registered no. OC303620) with its registered office at Beaufort House, Tenth Floor, 15 St. Botolph Street, London EC3A 7EE, England. Reed Smith Richards Butler LLP is regulated by the Law Society.

A list of members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. Any reference in this email to a partner of Reed Smith Richards Butler LLP is to a person who is a member of Reed Smith Richards Butler LLP or to an employee of equivalent standing. Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA.

This e-mail is confidential and may be protected by legal privilege. If you have received it in error, you are on

"Apostolos HE - Without Prejudice" Page 5 of 5

notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation. Please contact us on **+44 (0) 20 7247 6555** if you need assistance.

Disclaimer Version RS.UK.1.01.03

19/09/2007