UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE RICE COMPANY,                :

                    Plaintiff,       :      07 Civ. 7077 (WHP)
                               :
    - against -                :      ECF Case
                               :
EXPRESS SEA TRANSPORT CORPORATION, :
                               :
                  Defendant.      :
-------------------------------------------------------------X

## DECLARATION OF HUGH MAXWELL TOWNSON

HUGH TOWNSON declares under penalty of perjury under the laws of the United States of America as follow:

     1.      I am acting Insurance and Claims Manager of ESTC, Express Sea Transport Corporation ("ESTC") and make this declaration on its behalf and in support of its response to the Plaintiff's Opposition to the Defendant's Motion to Vacate or Reduce the Order for Attachment and For Countersecurity, and the supporting declaration of Mr Diego Garat, Traffic & Risk Manager for the Plaintiff. This declaration supplements my first declaration in this matter, dated 10 September 2007 (the "first declaration").

     2.      I have acted in this capacity for the Defendant since June 2006. Prior to that I was employed for 32 years in shipping operations and ship-operations' risk management both with ship-owners, including (for example) Overseas Shipholding Group, and (for 17 years) with UK P&I Club as a senior claims-handler and director of the managers' London Agents, responsible for both liability (P&I) and commercial (FDD) claims, including charterparty claims such as this. I am accordingly very familiar with the operational, chartering and legal principles and issues which surround the instant case.

     3.      I note Mr Garat states at paragraph 6 of his declaration that "*[u]pon being advised that ESTC had cancelled the charter party, I investigated the charter hire market and*



*was able to ascertain that for vessel similar to the M/V APOSTOLOS II, the charter hire rate was $36,409.00 per day.*" I address the issue of the market rate of hire in detail below, but for the time being simply wish to highlight that Mr Garat's above statement is inconsistent with the fact that his calculations and contentions as to market rate appear to be based on market data for 23 July 2007, which was nearly *3 weeks* after the charter had been cancelled on 3 July. Given that the market was rising at the time of the cancellation, and continued to rise throughout the period from 3 to 23 July – which is acknowledged by Mr Garat in paragraph 3 of his declaration – the effect of assessing the market rate of hire according to data published on 23 July simply serves to increase improperly the quantum of the Plaintiff's claim.

4.      Further, I am advised by the Defendant's English solicitors that the Plaintiff was under a duty to take reasonable steps to mitigate its alleged loss following the cancellation of the charterparty on 3 July, and that the Plaintiff is not entitled as a matter of English law to recover damages in respect of any losses which could have been avoided by such reasonable steps. Therefore (leaving to one side the Defendant's argument that the Plaintiff could have mitigated its loss by re-chartering the "Apostolos II" at US$28,500 per day – on which, see paragraph 21 of my first declaration), if the Plaintiff did in fact only begin looking for a substitute vessel on 23 July, given that the market had been rising from the time of cancellation of the charterparty dated 4 April 2007, the Plaintiff plainly failed to take appropriate steps in mitigation, and it would not be entitled to recover damages by reference to the rate of hire on 23 July.

5.      I note Mr Garat sets out in paragraph 4 of his declaration a summary of the chain of charterparties below the charterparty between the Plaintiff and the Defendant. I further note that Mr Garat states in the same paragraph that:



*"BHP-Biliton [as sub charterers] loaded a cargo of Australian alumina... [at] Bunbury and order the vessel to the port of Bandar Imam Khomeini, Iran, where is discharged from 19 July... While [the Plaintiff] became aware of the instructions from BHP-Biliton ordering the ship to Iran it could not contractually prevent the vessel from going to that country, nor did it believe that its involvement violated Executive order 13059 nor the previous Executive Orders issued with respect to trade to Iran. "*

6.      In my view, Mr Garat's account misrepresents the true nature of the Plaintiff's obligations under the charterparty between the Plaintiff and the Defendant dated 4 April 2007, and its role in ordering the vessel to Bandar Imam Khomeini in Iran. In that respect, the Plaintiff, as the charterer of the vessel, was obliged to provide the Defendant, as the vessel's disponent owner, with orders as to the vessel's employment, and each and every one of the vessel's numerous calls during the charter period was on the express and direct instructions of the Plaintiff (albeit that those instructions may have come up through the charter chain before being given by Plaintiff to the Defendant). The short point is that I understand that "US persons" are prohibited under US law from trading to countries including Iran, yet the vessel was nonetheless sent to Bandar Imam Khomeini in Iran on the express and direct instructions of the Plaintiff.

7.      I note that Mr Garat states (in the above excerpt from paragraph 4) that the Plaintiff *"could not contractually prevent the vessel from going to [Iran]"*. What Mr Garat fails to mention, however, is that if the Plaintiff wished to ensure that it would not violate the US Treasury Department's Office of Foreign Asset Control ("OFAC") prohibition on US persons trading with Iran, the Plaintiff could easily have excluded Iran from the permitted trading areas under the sub charter with Helena Chartering. This would have meant that the Plaintiff was not under any contractual obligation – and indeed could refuse – to comply with

3



orders to sail to Iran. In fact, my understanding is that companies which are "US persons" for the purpose of the prohibition under US law on trading with the enemy and which wish to sub charter vessels to third parties typically exclude Iran (and other prohibited countries/regions) from the permitted trading areas under the sub charter to ensure there is no violation. The reality, therefore, is that on any view, the call at Iran was entirely within the power and responsibility of the Plaintiff.

8.       Mr Garat's account also fails to explain and is at odds with the Plaintiff's email of 12 June, which I referred to in paragraph 16 of my first declaration. In that email, the Plaintiff (i) confirmed to the Defendant that the vessel was required to call at Iran, and (ii) indicated that the vessel had been fixed on a back to back basis by the Plaintiff to its offshore affiliate company, Helena Chartering, apparently in an effort to distance the Plaintiff from the OFAC prohibition on US persons trading with Iran and conceal its breach of that prohibition.

9.       I note Mr Garat has also failed to explain why the Plaintiff's English lawyers failed to answer the Defendant's English lawyer's numerous requests for confirmation as to whether the Plaintiff held a licence for trade to Iran.

10.      I also note Mr Garat indicates in paragraph 4 of his declaration that the Plaintiff has "*advised [OFAC] of the situation*". My understanding is that a party typically submits a report to OFAC in circumstances where it is aware it has violated US law on trading with the enemy, and the self-reporting process amounts to an effort to mitigate any penalties imposed by OFAC. Against that background, the fact that the Plaintiff has apparently self-reported its breach of the OFAC prohibition suggests that, despite Mr Garat's statements to the contrary, the Plaintiff is aware it has violated US law in connection with the voyage to Iran. Further, Mr Garat has still not revealed what earnings the Plaintiff continued to enjoy for the voyage to Iran after the withdrawal of the vessel by the Defendant, which earnings do not appear to have been credited for in the Plaintiff's calculation of alleged loss.



11.     I note Mr Garat sets out in paragraphs 3 to 5 of his declaration a summary of the background to the Plaintiff's Supplemental Rule B application on 9 August. I do not believe it is necessary for the purposes of these proceedings to respond to that summary, save only to note that the Defendant denies any liability whatsoever to the Plaintiff and, indeed, has a counterclaim against the Plaintiff in the London arbitration.

12.     I note Mr Garat alleges in paragraph 7 of his declaration that my first declaration contains *"certain misstatements and omissions"*. For the reasons set out below, I do not agree.

13.     Mr Garat also alleges in paragraph 7 that I state in my first declaration that *"ESTC offered to re-charter the vessel [to the Plaintiff] at a daily rate of US$28,500, which he asserts was the market rate for the vessel at that time"*. That is not correct: In fact, I stated at paragraph 20 of my first declaration that US$28,500 was *"about the market rate for the vessel at that time"* (my emphasis).

14.     I further note that Mr Garat alleges that *"the market rate for a vessel similar to the APOSTOLOS II was approximately $36,409.00 per day"*, rather than *about* US$28,500. I do not agree and, as explained below, maintain the view that the market rate for a substitute vessel at the time the Defendant re-offered her to the Plaintiff on 11 July 2007 was about US$28,500, and the market rate for a substitute vessel at the time of the (alleged) wrongful withdrawal of the vessel and cancellation of the charterparty was also about the same figure.

15.     This is important, because under English law, the normal measure of damages in respect of the (alleged) wrongful withdrawal of a vessel and cancellation of a charterparty is the difference between the charter rate of hire and the market rate for chartering in a substitute ship at or about the time of the breach for the balance of a charter period. I attach an excerpt from <u>Time Charters</u>, which is one of the leading practitioner's works on the English law relating to time charter parties. I am advised by the Defendant's English



solicitors – Reed Smith Richards Butler LLP ("RSRB") - that the principle set out above and in paragraph 16.116 of Time Charters, which was established in the case of The Elena d'Amico [1980] 1 Lloyd's Rep. 75, remains good and current law. *See Exhibit "1" annexed hereto.*

16.    The fact that the Plaintiff's damages are as a matter of law assessed according to the difference between charter rate of hire and the market rate for chartering in a substitute ship for the balance of a charter period may actually explain why the Plaintiff has failed to serve its Claim Submissions in the London arbitration, despite having commenced arbitration as long ago as 17 July: In those Claim Submissions, the Plaintiff will (if its claim is to have any credibility) be required to quantify its claim according to the market rate for substituting a replacement vessel at or shortly after the time of the cancellation of the charterparty dated 4 April 2007.

17.    I deal with the issue of market rate – and specifically with Mr Garat's various allegations and assertions in that respect – below.  However, at this stage, I should mention that the calculations set out in paragraph 9 of Mr Garat's declaration fly in the face of the principle of English law referred to above.  In particular, Mr Garat appears to be suggesting that the Plaintiff's loss should be assessed according to what the Plaintiff could have earned if she had been sub-chartered out on the spot market, for a time charter trip of short duration or a voyage charter.  That analysis is fundamentally flawed: as noted above, as a matter of law, the correct measure of the Plaintiff's alleged loss is the difference between the charter rate of hire and the market rate for chartering in a substitute ship for the balance of a charter period.

18.    In my view, the most compelling and tangible evidence of the relevant market rate for an alternative fixture for the balance of the "Apostolos II" charter with the Plaintiff is provided by the rate of hire at which the vessel was actually chartered out following the Plaintiff's rejection of the Defendant's re-offer.



19.    In that respect, after the Plaintiff rejected the Defendant's re-offer, in an effort to mitigate the losses arising out of the Plaintiff's breach of contract, the Defendant marketed the vessel for alternative business.

20.    On 1 August 2007, the Defendant time chartered the vessel to Stemcor (UK) Ltd ("Stemcor"), a first class charterer based in the UK, on terms providing for redelivery between 12 March 2008 and 11 June 2008 in Stemcor's option, and payment of hire at a daily rate of US$28,500. *See Exhibit "2" annexed hereto.* It was obviously in the Defendant's interests to charter the vessel out at the highest possible rate, and the rate of US$28,500 was in fact the best rate available in the market at the relevant time.

21.    Since Stemcor and the Defendant share the same London brokers, Curzon Maritime Ltd, I also understand from Curzon that the vessel was promptly sub-chartered by Stemcor for her first voyage in their charter to the Mauritius Sugar Syndicate at a freight rate of US$75 per mt for 31,000 mt of sugar in bulk for a voyage from Port Louis, Mauritius, via the Suez Canal, to London, England (most of the Mauritius crop sold through the MSS is sold to Tate & Lyle in London). It is market knowledge that the Mauritius Sugar Syndicate is a Mauritius government concern and their tonnage requirements are broked through Allansons Shipping and Galbraiths who go into the market to search out the best rates for their principals. I exhibit to this declaration a voyage result for that business showing that the time charter hire rate equivalent, being US$24,891, is very similar to the rate of hire under the charter between the Defendant and Stemcor. This further supports the view that the market rate following the withdrawal/cancellation was about US$28,500 per day, as mentioned in my first declaration. *See Exhibit "3" annexed hereto.*

22.    Further, the terms of the time charter to Stemcor were materially consistent with the terms of the original charterparty (dated 4 April 2007) between the Plaintiff and the



7

Defendant, and indeed the re-offer: the charter contained nothing which reduced or limited the charter rate.

23.    In fact, importantly in that respect, the time charter to Stemcor was for almost exactly the same period for which the Defendant offered to re-charter the vessel to the Plaintiff, and the period of a charter is a key factor in fixing the rate of hire: In its email to the Plaintiff on 11 July, the Defendant stipulated that the re-offer was *"for a period to min March 12th 2008, / max June 12th 2008"*. This period reflected the terms of the original charterparty (dated 4 April 2007) between the Plaintiff and the Defendant which, being for a period of minimum 11, maximum 13 months, would have resulted in the vessel being redelivered by the Plaintiff to the Defendant between March and June 2008. The charter to Stemcor was, as noted above, for materially the same term: until minimum 12 March 2008, maximum 11 June 2008. Given that under English law the proper measure of damages in respect of the cancellation of a charterparty is as noted above the difference between the charter rate of hire and the market rate for chartering in a substitute ship for the balance of a charter period, I respectfully submit that this is the best evidence of the rate for a replacement ship for the balance of the charter period.

24.    I am mindful that the vessel was chartered to Stemcor nearly two weeks after she had been re-offered to the Plaintiff. However, the vessel had been marketed throughout the intervening period, and US$28,500 was the best rate available in the market at any time from 11 July to 1 August. The short point is that, in my view, the charter to Stemcor provides compelling support for the fact that the market rate for the vessel was, as I said in my first declaration, about US$28,500 per day.

25.    There are several other serious flaws in the analysis – set out in paragraphs 7 to 11 of his declaration – that leads Mr Garat to the conclusion that the market rate of hire for the mv "Apostolos II" (or a substitute vessel) at the relevant time was US$36,409.



26.    First, Mr Garat's entire analysis is premised on the basis that the "Apostolos II" *"falls into the "Handy" category"* and that the specification for that category is a "minimum": see paragraphs 7 and 8 of his declaration. The Handysize specification is what it is and is not intended to be a "minimum". My belief and understanding is that the vessel does not fit into the "Handy" size vessel category, and whilst the Baltic Exchange Handysize Index is some evidence of what was happening in the market, since the "Apostolos II" clearly falls outside the exact specification to which the Baltic Handy is built, a more balanced approach should be taken in ascertaining the rate for a substitute.

27.    In that respect, Mr Garat fails to account for and/or mention in his declaration the various significant respects in which the vessel does not conform to typical Handy size specifications and characteristics. For example, in addition to the discrepancies highlighted by Mr Garat in paragraph 8 of his declaration: (a) the vessel has a beam of 28 metres, whereas a Handy size vessel should have a beam of 27 metres; (b) the vessel has a LoA of 179.28 metres, whereas a Handy size vessel should have a LoA of 169 metres; (c) the vessel has an average speed and consumption of about 13.5 knots on about 27.5 metric tons of IFO (380), whereas a Handy size vessel should have speed and consumption figures of 14 knots on 22 metric tons IFO (380); and (d) the vessel is equipped with grabs, whereas a typical Handy size vessel is not.

28.    These differences have significant consequences. For example, most charterers considering taking any vessel on period charter will prefer to take a "standard" type - i.e. a vessel which corresponds exactly or closely with the Baltic Handysize vessel specification – because it enables the charterer/operator to take a more accurate position and assessment of the market by reference to the Baltic Handysize Index. Further, the vessel is unable to call at numerous ports which Handysize vessels are able to call at, including various West African ports (i.e. because of port restrictions on the size of vessels). Additionally, as



noted above, the vessel's speed and consumption is higher than one would expect with a typical Handysize vessel, and taking bunker values in July the speed/consumption costs for the "Apostolos II" would be US$2,275 per day higher than the Baltic Handysize, which naturally results in a discount in the rate to take account of this extra daily expense. Also, since a typical Handysize cargo would be about 25,000 mt 5% more or less, economies of scale mean that many cargoes would be unsuitable to efficiently utilise the greater deadweight capacity of the "Apostolos II" at 34,676 mt. The upshot is that many prospective charterers would be reluctant to charter the vessel at a Handysize rate, the Handysize market will often trade at a premium to the rate attainable for the "Apostolos II", and the market for the "Apostolos II" is more readily aligned with the Baltic Supramax Index. The official Supramax particulars, as published by the Baltic Exchange, are attached. *See Exhibit "4" annexed hereto.*

29.    Leaving aside that the categorisation of the vessel as a Handysize vessel is wrong, the second main flaw in Mr Garat's analysis concerns the data used for the purpose of his calculations as to market rate. Mr Garat says in paragraph 7 of his declaration that the Clarkson's report concerns *"hire rates on time charters in certain markets"* and has apparently performed two different calculations in an effort to ascertain the market rate. The first – referred to in paragraph 9 of his declaration – is based on *"an average of the six routes in the "Handy" category"*. However, whilst it is correct that the data published by Clarkson does concern time charters, they are not period charters but charters for short trips. So the six routes quoted by Clarksons goes only to the determination of the market rate merely for a trip (i.e. voyage between two areas) on those specific routes as at 23 July. I exhibit to this declaration the Route Descriptions published by the Baltic Exchange, which explain each of the routes referred to in the Clarkson report relied upon by the Plaintiff, and which confirm that the business concerned is not for a period but by reference to a particular voyage. *See*



*Exhibit "5" annexed hereto.* The Plaintiff's claim, on the other hand, as I have said above, should properly be for losses allegedly incurred as a result of the cancellation of a time charter which had between 8 and 11 months left to run at the time of cancellation, under which the vessel was not confined to any specific routes. Consequently, the figures referred to and calculations set out in paragraph 9 are irrelevant in approaching the measure of alleged damages.

30.    The second of Mr Garat's calculations – referred to in paragraph 10 of his declaration – is based on the *"Handysize FFA Curve STC"*, which reflects the market rate for (a Handysize) vessel on a specific day for the purpose of forward agreements. As I have said, this curve is based upon spot market figures, and the most compelling evidence for the "Apostolos II" is the actual rate at which she was chartered out by the Defendant following the withdrawal in July.

31.    Third, and importantly, Mr Garat has inexplicably based his analysis on data concerning the market rate on 23 July 2007. I do not understand why Mr Garat used data for that particular date (other than, perhaps, because looking at the Clarkson report, 23 July was above the month average and possibly even the high point for July) and, notably, there is no explanation in his declaration. In any case, it is obviously nonsensical for Mr Garat to challenge my contention that the market rate for the vessel at the time she was re-offered to the Plaintiff – on 11 July (just a week after the withdrawal) – was US$28,500 per day on the basis of data pertaining to the market rate for 23 July. Therefore, even if Mr Garat's calculations as to market rate were sound in all other respects – which for the reasons set out in this declaration is in my view not the case – they are nonetheless irrelevant for the purpose of fixing the quantum of the Plaintiff's claim.

32.    Against this background, calculations as to the market rate for the vessel on and around 3 and 10 July, adopting Mr Garat's basic methodology of calculating the market



11

rate by reference to the "*FFA Curve 6TC*", taking the figures for the "*Supramax FFA Curve 6TC*", (despite the reservations mentioned above), but based on (i) the "Baltic Supramax Index", as published by Clarkson, rather than the inapposite Handysize figures, and (ii) the data published for 3 July (date of the withdrawal/cancellation) and 10 July (a week thereafter), being the dates between which the Plaintiff would have been looking to fix substitute tonnage, rather than 23 July, appear as follows.

33.    Taking the data for the six routes in the Supramax market on 3 July, and looking at quoted average rates in the forward curve for the third and fourth quarters of 2007 (US$42,875 and US$42,750 respectively), and the average for the first and second quarters of 2008 (US$35,875), the average daily forward rate was US$39,344 per day.  Dividing that sum by the typical Supramax deadweight of 52,454 gives a figure of US$0.75 per ton per day.  Applying that figure to the "Apostolos II" deadweight of 34,676 (i.e. US$0.75 x 34,676) gives a daily rate of hire of US$26,009.  See *Exhibit "6" annexed hereto.*

34.    Applying the same rationale to the published data for 10 July gives a daily rate of US$27,145.  The average rate for the three days including those either side of 10 July (i.e. including 9 and 11 July) is US$27,290.  See *Exhibit "7" annexed hereto.*

35.    Accordingly, even if one adopts Mr Garat's methodology for calculating the market rate of hire, but uses more apposite data, the market rate at the relevant time is not US$36,409, as the Plaintiff alleges but about US$28,500, as stated in my first declaration, and which again goes to show that the most compelling evidence of the market rate is the actual fixture for the "Apostolos II".

36.    Against this background, I maintain the view set out in my first declaration: that the Plaintiff is obviously not entitled to recover as damages (or to be secured in respect of) a sum representing hire for the balance of the charter period on the basis of a rate of hire on  US$36,409  in  circumstances  where  (a)  the  market  rate  following  the



withdrawal/cancellation was about US$28,500, (b) the vessel was re-offered to the Plaintiff at the market rate of US$28,500 on 11 July, and (c) the Plaintiff wrongly appears to be claiming for loss of profit (at the wrong rate) in the freight market, rather than for losses associated with the cost of replacing like for like.

37.     The suggestion by Mr Garat in the final sentence of paragraph 11 of his declaration that "*the sole purpose*" of the Defendant re-offering the vessel to the Plaintiff was to cap any damages is not true in the pejorative sense implied and, notably, Mr Garat fails to cite any supporting evidence.   The reality is that the Defendant's re-offer represented a genuine attempt to resolve the differences between the parties on an amicable and commercial basis.   However, the vessel was offered to the Plaintiff at a daily rate of US$28,500, which on the face of it completely undermines the Plaintiff's case that it is entitled to recover damages in respect of the balance of the charter period based on a daily rate of US$36,409.  I note that despite Mr Garat's bald contention that the sole purpose of the re-offer was to cap the Plaintiff's damages, once the flaws in his arguments concerning the market rate at 11 July have been exposed, there is nothing in Mr Garat's declaration which challenges the view that the Plaintiff's claimed damages should not in fact be so capped.

38.     With reference to paragraph 12 of his declaration, Mr Garat fails to mention the terms of the Plaintiff's oral without prejudice counter offer, although he does attach "without prejudice" correspondence which details the terms of that counter offer.   In that respect, it is notable that the Plaintiff's counter offer was predicated on the basis that the appropriate rate of hire for the vessel was US$28,500.

39.     In paragraphs 13 to 16 of his declaration, Mr Garat misrepresents the parties' discussions and negotiations concerning the re-offer and prospective re-charter.  First, in paragraph 13, Mr Garat quotes an excerpt from correspondence in which the Defendant repeated its offer to charter the vessel back to the Plaintiff at a rate of US$28,500 per day, and



highlights certain words in bold font. What Mr Garat fails to highlight, however, is the express statement by the Defendant that it was "*willing to repeat [its] offer of yesterday...*" (my emphasis). The offer which was being repeated was (as noted in paragraph 11 of Mr Garat's declaration) for the re-charter of the vessel at a daily rate of US$28,500 "*subject to a minor revision of the hire payment details to clarify charterers' payment obligations...*"

40.    Later the same day, the Plaintiff purported to accept the Defendant's offer by agreeing "*an increase in the daily rate to US$28,500, effective immediately, with a minimum charter period up to 12 March 2008, and a maximum charter period up to 12 June 2008, with all other terms to be as per charter dated 4 April 2007*".

41.    Against that background, the suggestion by Mr Garat in paragraphs 14 and 15 of his declaration that the Plaintiff accepted the Defendant's offer is plainly wrong. In fact, as the Defendant's English solicitors – RSRB – pointed out in their email of 17 July, which is exhibited to Mr Garat's declaration, the Plaintiff's purported acceptance of the offer was silent as to the revision of the hire payment details in clause 30. The fact that the revision of that clause was a term of the Defendant's offer was set out expressly in the Defendant's original offer on 11 July, and when the Defendant restated its offer on 13 July it expressly stated that it was repeating its offer of 11 July. The short point is that it is clear that the re-offer was on terms that the Plaintiff was required to pay hire at a daily rate of US$28,500, and that the hire payment provisions in clause 30 would be revised to avoid the scenario which had led to the withdrawal under the original charterparty. Consequently, the Plaintiff's purported acceptance of the re-offer was not in fact a valid acceptance, and this was pointed out to the Plaintiff by the Defendant in an email dated 17 July (as well as by RSRB in their message the same day). It follows that, contrary to Mr Garat's allegation in paragraph 16, there was absolutely no "*backtracking*" by the Defendant. To the contrary, the Defendant's position was consistent and clear throughout.

14



42.    With reference to paragraph 19 of Mr Garat's declaration, it is correct that from 18 July, there was an exchange between the Plaintiff's and Defendant's respective English lawyers – being, respectively, Winter Scott ("WS") and RSRB – regarding (*inter alia*) the revision of the hire payment provisions in clause 30.    The purpose of that correspondence was to clarify what was required by way of revision of clause 30 for the purpose of the Defendant's re-offer.

43.    It is not correct, however, that "*the upshot was that [the Defendant] withdrew its offer to charter the [vessel] for US$28,500 per day on July 20, 2007*".    In fact, as the documentation exhibited to Mr Garat's declaration illustrates, following several exchanges over 18-19 July, on 19 July RSRB on behalf of the Defendant sent WS an email which set out in detail the terms of the proposed revision to clause 30, and on that basis repeated the Defendant's offer to charter the vessel back to the Plaintiff at a daily rate of US$28,500. RSRB's email also made it clear that the offer was open to clean acceptance by the Plaintiff until noon on 20 July.

44.    In response to that message, at shortly before the noon deadline on 20 July, WS sent an email to RSRB containing counter proposals concerning the terms of the revised clause 30. Therefore, given that the Plaintiff failed to accept the Defendant's offer of 19 July by noon on 20 July, the offer lapsed, and in an email sent by RSRB to WS later on 20 July, RSRB informed WS that the Defendant was suspending fixture negotiations with the Plaintiff.

45.    I do not understand the basis upon which Mr Garat alleges in paragraph 20 of his declaration that the Defendant's offer voluntarily to provide the Plaintiff with security for its claim "*could in no way be considered security for [the Plaintiff's] claim and was a sham*". The reality – as noted in paragraphs 5 and 6 of my first declaration – was that the Defendant's initial offer on 11 July to provide the Plaintiff with security for its claim was silent as to the



form and precise quantum of security, so it is simply nonsensical for Mr Garat to suggest that the offer was for security that was somehow inadequate or unsatisfactory.

46.    In any case, having heard nothing at all from the Plaintiff in response to its original offer on 11 July, as noted in my first declaration, on 24 July the Defendant offered to provide security by way of a letter of undertaking.  Once again, the Defendant heard nothing at all from the Plaintiff in response to its offer.  However, if the Plaintiff's genuine view was the Defendant's offer was somehow unsatisfactory, in my view the sensible and commercial reaction would have been to revert to the Defendant to seek to discuss and negotiate the terms of security, in the normal way.  I made this point in my first declaration, and it is notable that Mr Garat has failed to explain why the Plaintiff failed to do so.

47.    I also note that Mr Garat has failed to offer any sensible or constructive explanation as to why the Plaintiff regarded (and apparently continues to regard) the Defendant's letter of undertaking as unsatisfactory security, nor indeed has he answered the points set out in paragraph 12 of my first declaration concerning the Plaintiff's decision to seek the Ex Parte Order before this Court in circumstances where (a) it was open to the Plaintiff to seek to negotiate the Defendant's offer (of 24 July) for the provision of security with a view to amicable agreement, (b) the Defendant has agreed to submit to the London tribunal for determination with regard to form and terms of security, and (c) the Defendant has offered to provide security by way of a bank guarantee.

48.    Mr Garat mentions in paragraph 20 of his declaration that the Defendant requested on 11 July that the Plaintiff inform the Court of the fact of the Defendant's offer to provide security, and suggests that this point supports his opinion that the offer was a tactical step intended to prevent the attachment of the Defendant's assets.  Preventing an attachment was indeed one of the aims of the Defendant's offer, but in my view, that fact does not mean that the Defendant's offer was somehow insincere.  To the contrary, it indicates that the



16

I

Defendant wanted to resolve the issue of security voluntarily and promptly, by agreement between the parties, to ensure that the unnecessary costs and potential disruption of an attachment were avoided. In fact, in my view, given that the Plaintiff determined to proceed with its application for an Ex Parte Order in circumstances where the Defendant had offered to provide security voluntarily, and to submit to the London tribunal for determination in the absence of agreement as to form and terms of security, it is the Plaintiff rather than the Defendant which has acted insincerely and attempted to illegitimately increase its tactical position and bargaining power with regard to the substantive dispute by seeking to attach the Defendant's assets.

49.    The suggestion by Mr Garat in paragraph 21 of his declaration that *"it was only on August 28... that [the Defendant's] attorneys offered to post security"* is plainly wrong. As noted above and in my first declaration, the Defendant offered to provide security as early as 11 July 2007, and again on 24 July. The Defendant's offer on 28 August was simply for the provision of security in alternative form to that offered on 24 July: that is, by way of bank guarantee, which was the form of security WS indicated (in its fax of 24 August) would be acceptable to the Plaintiff.

50.    I should mention at this stage that I do not understand why the Plaintiff waited until 24 August – over two weeks after its application for the Ex Parte Order – to provide an indication as to the form of security it sought, and why it did not do so in response to the Defendant's original offer for the provision of security on 11 July.

51.    Further, with reference to paragraph 22 of Mr Garat's declaration, I do not agree that the offer for the provision of a bank guarantee *"was unacceptable as it placed on [the Plaintiff] the burden of paying for the guarantee"*. In fact, in circumstances where the Plaintiff failed to explain why the letter of undertaking offered by the Defendant was not acceptable, and/or why it was not prepared to submit the matter for determination by the



17

Tribunal, it is, in my view, entirely reasonable and appropriate that the Plaintiff should pay the costs of a bank guarantee.

52.    With reference to paragraph 24 of Mr Garat's declaration, whilst it is correct that the Defendant has not provided security for the Plaintiff's claim, the Defendant has maintained its offer to provide security by way of a letter of undertaking (which the Plaintiff has failed to demonstrate is objectively unsatisfactory) or bank guarantee (on the terms set out in RSRB's message of 28 August), and to submit to the London tribunal in the absence of agreement as to the form and terms of security.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of October 2007 at Piraeus, Greece.

Hugh Maxwell Townson

18