**Exhibit 1**

# TIME
# CHARTERS

FIFTH EDITION BY

## MICHAEL WILFORD
*Solicitor*
*Former Partner, Clyde & Co.*

## TERENCE COGHLIN
*Former Chairman, Thomas Miller & Co.*

## JOHN D. KIMBALL
*New York, Attorney*
*Healy & Baillie, LLP*



LONDON    HONG KONG
2003

**16.113**                            PAYMENT OF HIRE AND WITHDRAWAL

pages 793 and 794. But in any event the wording of the withdrawal clauses in the New York Produce form and Baltime form can be distinguished from the wording of the clauses in the *Lombard North Central* case, in that in the latter there was an express reference to time being "of the essence". This might not be a material distinction where there are interdependent obligations (see *Bunge* v. *Tradax*, above), but it is suggested that the obligation to pay hire by the due date does not fall into this category.

**16.114**  The question remains whether the statements of Lord Diplock, Lord Roskill and Rix, L.J., above, are to be taken to mean that the payment of hire and withdrawal clause constitutes (or, on the basis of the remark of Rix, L.J., may constitute) a condition in the fullest sense of that term. It would have the result that on a falling market the owners, having withdrawn because of some slight delay in the payment of hire, could go on to recover damages for the loss of the charter—a surprising result even though that is, apparently, the position under American law (see paragraph 16.169). However, none of these four observations was directed to the issue of damages after withdrawal. Moreover, three were *obiter* and, although the other—Lord Diplock's comments in *The Afovos*—formed part of his reasoning in that case, it has been pointed out that he could have reached the same conclusion for a more straightforward reason: see Reynolds [1984] LMCLQ 189. It may in any event be that all that was meant was that by adding an option to withdraw to the payment of hire obligation, the parties themselves gave to that obligation one characteristic of a true condition or essential term, namely that breach entitles the innocent party to treat the contract as discharged.

**16.115**  It is submitted, in conclusion, that it is not necessary to treat the ordinary payment of hire and withdrawal clause in a time charter as a condition in the strict sense, so as to entitle the owners to recover damages for loss of the charter upon any breach, however slight, when what is to happen in the event of late payment of hire is expressly provided for by the clause. It is considered that damages for loss of the charter should be recoverable only in cases where the failure to pay hire by the due date can be shown to be repudiatory. But uncertainty remains until the House of Lords has shed more light on this important question.

*Measure of damages for wrongful withdrawal or repudiation by owners*

**16.116**  If at, or shortly after, the time of wrongful withdrawal or repudiation there is an available market, the normal measure of damages will be the difference between the charter rate of hire and the market rate for chartering in a substitute ship for the balance of the charter period. If, however, the charterers decide not to take advantage of the market, that will be their own business decision, independent of the wrong; and the consequences of the decision are theirs. If they judge the market correctly, they reap the benefit; if they judge it incorrectly, then the extra cost falls upon them. See Robert Goff, J., in *The Elena d'Amico* [1980] 1 Lloyd's Rep. 75, at page 89, Mustill, J., in *The Wave* [1981] 1 Lloyd's Rep. 521, at page 532, and *Norden* v. *André* [2003] 1 Lloyd's Rep. 287.

**Injunction**

**16.117**  For the circumstances in which the court may grant injunctions where owners withdraw or threaten to withdraw their ship, see paragraphs 3.26 to 3.28.

**Exhibit 2**



# ORIGINAL
## Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

CLARKSON PORT AND SHIPPING LIMITED
ST. CLARE HOUSE
30-33 MINORIES
LONDON EC3N 1DJ
Tel: 020 7480 1208  Tlx: 911828 Fax: 020 7488 1…

1  **This Charter Party,** made and concluded in London ............................................. 1st ...... day of August ............................ 1920.
2  Between Messrs EXPRESS SEA TRANSPORT CORP., Panama ....................................................................................... as disponent
3  Owners of the good *Bahamas Flag* ............... Steamship/Motorship *"APOSTOLOS II"* – *Built 2003 – Description as per Clause 29* of
4  of ...................................... ~~tons gross register, and~~ ...................................... ~~tons net register, having engines of~~ ........................... indicated horse pot
5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~
6  ~~at~~ ...................................... ~~of about~~ ...................................... ~~cubic feet bale capacity, and about~~ ...................................... ~~tons of 2240 lbs.~~
7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capac~~
8  ~~allowing a minimum of fifty tons) on a draft of~~ ...................................... ~~feet~~ ...................................... ~~inches on~~ ...................................... ~~Summer freeboard, inclusive of permanent bunke~~
9  ~~which are of the capacity of about~~ ...................................... ~~tons of fuel, and capable of steaming, fully laden, under good weath~~
10  ~~conditions about~~ ...................................... ~~knots on a consumption of about~~ ...................................... ~~tons of best Welsh coal—best grade fuel oil—best grade Diesel o~~
11  now *trading* ......................................................................................................................................................................................................
12  ...................................... and Messrs STEMCOR (UK) LIMITED ............... Charterers of the City of *London* .....................

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery,
14  about *a Time Charter Period, redelivery earliest 12.03.2008 and latest 11.06.2008 in Charterers option always via safe port(*
15  *safe berth(s), safe anchorage(s), always afloat, always within IWL via ice free ports/areas in Charterers' option NAABSA as p*
   *Clause 6 at Brazil and Argentina only. No option to break IWL.* within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterer remaining responsible for
17  the fulfilment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, at *passing Muscat outbound at any time, day or night, Sundays and Holidays include*
19  ~~in such dock, or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6),~~
20  ~~the Charterers may direct. If such dock, wharf or place be not available time to await as provided for in clause No. 6.~~ Vessel on her *arrival at first loadpo*
21  *delivery* to be
22  ready to receive *Charterers'* cargo *(See also Clause 59)* with clean-swept *and fresh water washed down holds and free from losse re*
   *scale and residues of previous cargoes and tight, staunch, strong and in every way fitted for the service, should the vessel fail inspection t*
   *vessel to be placed off-hire pro rata to the numbers of holds rejected from the moment of rejection until she passes reinspecti*
   *and bunkers consumed during this period to be for Owners' account* having water ballast, winches and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the sa
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merch
25  dise, ~~including petroleum or its products, in proper containers,~~ excluding *(See Clause 59)*
26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their ri~~
27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British No~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and~~
29  ~~Mexico, and/or South America~~ .............................................................................................................................................................. and/or Euro
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence betwe~~
31  ~~October 31st and May 15th, Hudson Bay, and all unsafe ports, also excluding~~ ...................................... ~~except of cotton, White Sea, Black Sea and the Balt~~
   Safe berth(s), safe anchorage(s), always afloat except NAABSA, as per Clause 6 always within Institute Warranty Limits. Car,
33  to be loaded according to IMO regulations (See also Clauses 55 and 58) ....................................................................................................
34  ..............................................................................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36    1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew, *and all other charg*
   *related to the Master, officers and crew* shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, *lubricating oil* and maintain her class a
   keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
39    2.  That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *necessary and customary Pilotage*
   *(Pilotage for Skaw (Spodsbjerg – Grenaa), Bosphorus and Dardanelles, Torres Strait, Great Belt, Magellan, Naikai Stra*
   *Kammon Kaikyo Strait to be for Charterers' account), customary and compulsory garbage removal,* Agencies, Commissic
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel pass t
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under t
43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous per~~
44  ~~of six months or more.~~
45    Charterers are to provide necessary dunnage and shifting-boards, *and any cargo battens that may be required,* also any extra fittings requisite f
46  a special trade or unusual cargo, but
47  Owners to allow them the use of any dunnage and shifting-boards already aboard vessel. ~~Charterers to have the privilege of using shifting-boa~~
   ~~for dunnage, they making good any damage thereto.~~

48    3.    (See Clause 43) That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remain

49    board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........................................................ tons and not more th

50    ........................................................ tons and to be re-delivered with not less than ........................................................ tons and not more than ........................................................ tor

51    4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 28,500 (Twenty Eight Thousand and Fi*

52    *Hundred Dollars) daily including overtime per day payable 15 days in advance* United States Currency per ton on vessel's total deadweig

carrying capacity, including bunkers and

53    stores, on ........................................................ summer freeboard, per Calendar Month, commencing on and from the *time and* day of her delivery, as aforesaid, fo

54    and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordina

55    wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot 1 safe port Singapore / Japan range includir*

56    *Malaysia / Philippines and Indonesia but not East of 120 degrees and if Java-Sumatra in Indonesia limited to Belawan-Gres*

*range at any time, day or night, Sundays and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less th

(See Clause 60) days

57    notice of vessels expected date of re-delivery, and probable port. *(See Clause 60)*

58    5.    Payment of said hire *less commissions* to be made in New York *(See Clause 30)* in cash in United States Currency, semi-monthly *every 1*

*days in advance,* and for the last *15 days* half-month or

59    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becom

60    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of t

61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Chi

62    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count *as from vessel's delivery* from 7 a.m. on t

working day

63    following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, th

64    to have the privilege of using vessel at once; such time used to count as hire.

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subje

66    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the applicati

67    of such advances.

68    6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe anchorage* place that Charterers or th

Agents may

69    direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *at Argentina and Brazil only* where it is customary f

similar size *or type* vessels to safely

70    lie aground.

71    7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), al

72    accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, *equipme*

73    tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charter

74    paying Owners ........................................................ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses

75    incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76    8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew a

77    boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment a

78    agency; and Charterers are to load, stow, and trim, *lash, secure, dunnage and discharge* the cargo at their expense under the supervision of the Capta

who is to sign *or is to authorise Charterers to sign* Bills of Lading for

79    cargo as presented, in conformity with Mate's and or Tally Clerk's receipts.

80    9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall

81    receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *under his own risk and always prior*

*his boarding to sign and deliver to vessel's Master Owners' relevant LOI* and see that voyages are prosecuted

83    with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at t

rate of $4.60 *USD 20.00* per day. *Charterers to pay Owners USD1,250.- per month or pro rata – payable every 15 days in advan*

*for cables/victualling/entertainment.* Owners to victual Pilots and Customs Officers, and also, when authorised by Charterers or their Agents, to vict

Tally

85    Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.

86    11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and t

87    Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Ch

88    terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the co

89    sumption of fuel. *Charterers are to provide their own forms for Master to complete.*

90    12.    That the Captain shall use diligence in caring for the *natural* ventilation of the cargo, *as per Charterers' instructions.*

91    13.    That the Charterers shall have the option of continuing this charter for a further period of ........................................................

92    ........................................................

93    on giving written notice thereof to the Owners or their Agents ........................................................ days previous to the expiration of the first named term, or any declared opti

94    14.    That if required by Charterers, time not to commence before *4th August 2007 – 00:01 hours* ........................................................ and should ves

95    not have given written notice of readiness on or before *9th August 2007* ........................................................ but not later than *24:00 hours* 4 p.m. Charterers

96    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97    15.    That in the event of the loss of time from deficiency *, sickness, strike, accident or default* of Master, officers or crew of deficien

98    of men or stores, fire, breakdown or damages to hull, machinery or equipment,

grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other ca

99    preventing the full *use of the vessel to the Charterers* working of the vessel, the payment of hire shall cease for the time thereby lost; *and all bunke*

*consumed during period of suspended hire shall be for Owners' account* and if upon the voyage the speed be reduced

100    defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequer

101 thereof, and all extra expenses shall be deducted from the hire.*Provided always the reason that resulted in any of the above events is not du
to an act or default or omission of the Charterers, their servants or agents, whether by way for negligence or otherwise.*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall 1
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Sea
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for th
106 purpose of saving life and property.*In case of property, Owners and Charterers to share equally return of salvage.*

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred *(as per Clause 73)* to three persons at Ne
108 York,
~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and f~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Ave
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or exce
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, whi
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses a
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15 inclusive, 17 to 22, inclusive, and Rule F
116 York-Antwerp Rules *1992 and latest amendments* 1924, at such port or place in the United States as may be selected by the carrier, and as to matters n
~~provided for by these~~
117 ~~Rules; according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged in~~
118 ~~United States money at the rate prevailing on the date made and allowances for damage to cargo claimed in foreign currency shall be converted~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carri~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of th~~
123 ~~carrier, be payable in United States money and remitted to the adjuster. When so remitted the deposit shall be held in a special account on th~~
124 ~~place of adjustment in the name of the carrier, payable on demand pending settlement of the General Average and refunds or credit balances, if any, shall be paid~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoev~~
127 ~~whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, t~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrific~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of th~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship~~
131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.*Hire not to contribute t
General Average.*

133 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and t
134 cost of replacing same, to be allowed by Owners.

135 21. That as the vessel may, from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at
136 convenient place, before cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning fr
137 time of last painting and payment of the hire to be suspended until she is again in proper state for the service.

138 ─────────────────────────────────────────────
139 ─────────────────────────────────────────────

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, al
141 providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear f
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide *free of expense, sufficient electric lightin
with vessel's light as on board, light clusters to permit work at hatches and overboard at the same time, on the vessel lanterns and t
fo
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over these on board to be at Charterers' expense. T*
144 Charterers to have the use of any gear on board the vessel.

145 23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging
146 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchme
147 deck-hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of th
148 port, or labor unions, prevent crew from driving winches, shore Winchman to be paid by Charterers. In the event of a disabled winch or winches,
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasion
150 thereby.

151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contain
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessel
153 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, be
154 of which are to be included in all bills of lading issued hereunder

155 U. S. A. Clause Paramount
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved Ap~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of ladi~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 Both to Blame Collision Clause
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of t~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carri~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such lo~~
164 ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other as re~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or h~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be wit

168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter th
169  port or to get out after having completed loading or discharging. *Vessel never to be ordered to force ice neither to follow Icebreakers.*
170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for th
171  navigation of the vessel, *her seaworthiness and maintenance, acts of pilots or tugboats,* insurance, crew, and all other matters, same as whi
       trading for their own account.
172      27.  A commission of ~~2 1/2~~ *1,25* per cent is payable by the Vessel and Owners to *Curzon Maritime Ltd., London*
173  ........................................................................................................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175      28.  ~~An address commission of 2 1/2 per cent payable to~~ ..................................................... ~~on the hire earned and paid under this Charter.~~


*Additional Clauses No 29 to 99, both Included hereto, are to be fully incorporated in this Charter Party.*


        The Owners;                                                    The Charterers:


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Sh
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or t
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as havi
been made by the licensee or end user as appropriate and not by the author.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

**Clause 29**
**Description Clause**

Const.
S7...
Stablem wit...15
LONDON ECON 1DJ
Tel 020 7451 1703 Th: 911233 ew ... 1733 49

**A) Specification**
1.    Vessel type and number of decks: Bulk carrier single deck
2.    Dwat summer / winter / fresh / tropical / tropical fresh:
      34676,9 / 33694,4 / 34681,0 / 35774,5 / 35646,6 mt
3.    Draft summer / winter / fresh / tropical / tropical fresh:
      10,650 / 10,428 / 10,897 / 10,872 / 11,119 m
4.    Dwat at following:

| Draft | Salt | Fresh | Brackish |
|---|---|---|---|
| 30 ft | 28052,5 mt | 27368,3 mt | 27778,8 mt |
| 31 ft | 29385,0 mt | 28668,3 mt | 29098,3 mt |
| 32 ft | 30722,1 mt | 29972,8 mt | 30422,4 mt |
| 33 ft | 32062,4 mt | 31280,4 mt | 31749,6 mt |
| 34 ft | 33406,5 mt | 32591,7 mt | 33080,6 mt |

5.    TPC/TPI: 44,257 / 112,4 mt at summer draft
6.    FWA: 24,7 cm
7.    GT/NT (1969): 22072 / 11132
8.    Suez GT/NT: 22646,81 / 20282,28
9.    Panama NT: 18400
10.   LOA/LBP/beam/depth moulded: 179,28 / 172,0 / 28,0 / 15,20 m
11.   Number holds/hatches: 5 / 5
12.   Hatch dimensions:    No 1 and 5      20,00 x 14,00 m
                          No 2, 3 and 4    20,08 x 19,60 m
13.   Hold dimensions (l x w on tanktop x h max height fm tanktop to Underside of the deck beams):
      No 1    25,60 x fwd 10,64/mid 19,48/aft 22,08 x 13,42 m
      No 2,3,4    24,80 x 22,08 x 13,42 m
      No 5    24,80 x fwd 22,08/mid 19,42/aft 12,20 x 13,42 m
14.   Total cubic capacity:   Grain 44020,5 cbm  Bale 42721,3 cbm
                             (Grain 1554567 cft/1508688 cft Bale)
15.   Cubic breakdown by holds:

|  | Grain | | Bale | |
|---|---|---|---|---|
| No 1 | 7590,1 cbm | ( 268038 cft) | 7366,0 cbm | ( 260127 cft) |
| No 2 | 9460,7 ' | ( 334102 ' } | 9181,5 ' | ( 324242 ') |
| No 3 | 9460,7 ' | ( 334102 ') | 9181,5 ' | ( 324242 ') |
| No 4 | 9460,7 ' | ( 334102 ') | 9181,5 ' | ( 324242 ') |
| No 5 | 8048,3 ' | ( 284223 ') | 7810,8 ' | ( 275835 ') |
| Total: | 44020,5 cbm (1554567 cft) | | 42721,3 cbm (1508688 cft) | |

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

16. Cargo gear: 4 x 30 mt electro-hydraulic cranes,
    Outreach of crane from ship's side at lowest angle: 11 m
    The proper working of cranes is given in ambient temperature range +30/-5
    degrees Celsius
17. Gear distribution: Between hatch no. 1 and 2, 2 and 3, 3 and 4, 4 and 5
18. Grabs fitted: yes
    Number: 3 sets
    Makers: Smag, Salzgitter
    Type: MZGL 8000-4-b-s, electro-hydraulic,
    Capacity (flaps closed): 8 cbm
    Weight of each grab: 7100 kgs
    Dimension across grab when closed: 2980 x 2940 mm
19. Hatch cover type: Flat topped double skin, hydraulically driven folding watertight
    steel covers designed by hamworthy kse
20. Strengths:
    Tanktops holds: 23,0 mt/sqm
    Deck: 2,5 mt/sqm
    Hatch covers: 2,5 mt/sqm
21. Wing tanks fitted: yes, not for cargo
    Side hopper tanks fitted: yes
22. Distance ships rail/hatch coaming: 3,8 - 6,6 m
23. Distance water line/hatch coaming:

|  | Ballast (heavy) | (normal) | Light condition | Laden (even keel) |
|---|---|---|---|---|
| No 1 hatch | 9,58 m | 12,60 m | 15,85 m | 6,50 m |
| No 3 hatch | 9,37 m | 11,70 m | 14,95 m | 6,55 m |
| No 5 hatch | 9,25 m | 10,75 m | 13,35 m | 6,55 m |

Providing that hatch covers will be open in all stages and subject cargo and/or
ballast and bunkers on board.

24. Lakes fitted and DWAT: no
25. Australian hold ladders fitted: yes
26. Suez and panama canal fitted: yes
27. Ice strengthened:
28. Cargo battens: no
29. Satellite communications on board:  Tlx no. 431152310
                                        Fax no. 331152312
                                        Tel no. 331152310/1
30. Grab discharge suitable: yes
31. Grain fitted: yes
32. Co2 fitted in holds: yes
33. Has vessel a closed sewage system: yes
34. Year / Month / Where built: 2003 / July / P.R.China
35. Flag: Bahamas
36. Port of registry: Nassau

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

37.  Register number: 730899
     Imo number: 9260158
38.  Class/mark/number: ABS/+A1(e), bulk carrier, sh grab, +AMS +accu/03113789
39.  Ventilation: fans (6 air changes per hour) and natural
40.  Log fittings: no
41.  Stanchions: no
42.  Container capacity and fittings: no
43.  E/b located: aft
44.  Any centre line bulk head/pillars/other obstructions: no
45.  Strengthened for heavy cargoes with alternate hold loading: yes
     Cargo hold no.2 and 4 may be empty when other full
46.  Air draft:        Light, distance sea to top radar mast 39,063 m
                       Ballast-norm., distance sea to top radar mast 36,430 m
                       Ballast-heavy, distance sea to top radar mast 35,100 m
                       Laden, distance sea to top radar mast 32,110 m
                       Distance keel to highest point 42,625 m
     Subject cargo and/or ballast and bunkers on board.
47.  Ex names/date of last name change: ivs viscount/04.11.2004

**B) Speed and consumption**
1.   Average speed: About 13.5 knots
     Average speed and consumption is given for good weather conditions upto
     Beaufort Scale 4 and Douglas Sea State 3
2.   Average consumption at sea, IFO 380 CST about 27,5 mt - no MGO
     When main engine starting/stopping, manoeuvring, navigating shallow or
     confined waters, entering and sailing ports, rivers and lakes, and for generator
     engine in case of low load operation vessel burns MGO in main engine
3.   In port consumption: Idle about 3,5 mt IFO 380 CST
     Working about 5,5 mt IFO 380 CST
4.   IFO and MGO specification: IFO 380 CST - RMG 35, ISO 8217 1996
     MGO - DMA, ISO 8217 1996
5.   Main engine type: Sulzer 6RTA48T-B

**C) Capacities**
1.   IFO capacity: 1469,3 cbm (85 pct)
2.   MGO capacity: 101,2 cbm (85 pct)
3.   FW capacity: 194 mt (100 pct)
4.   Unpumpable bunkers: IFO 50 mt / MGO 5 mt
5.   Ballast capacity: Normal 11801 cbm
     Heavy 21261,7 cbm  (including Hold no.3)
6.   Daily FW consumption: 12 mt
7.   Evaporator and output: 15 mt/day
8.   Constants excluding fresh water: 300 mt
     Constants including minimum fresh water: 450 mt
     All details about, given in good faith, without guarantee.

M/V "ÁPOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

### Clause 30
**Hire Payment**

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account, details as below, Charterers will not agree to the assignment of hire, monies due under this Charter Party, or the Charter Party itself in any circumstances whatsoever.

Bank details:            Alpha Bank AE
                         Piraeus Shipping Branch
                         89 Akti Miaouli Street
                         Piraeus, Greece
                         Tel no: +30 210 4290208
                         Fax no: +30 210 4290348
                         Iban no: GR36 0140 9600 9600 1500 6007 550
                         Swift no: CRBAGRAA
                         A/C no: 960-01-500600-7550
                         In favour of: Express Sea Transport Corp.
                         Reference: STEMCOR - C/P 01.08.2007

USD correspondent:       Citibank Na, New York
                         399 Park Avenue
                         New York, N.Y. 10022, USA
                         Swift no: CITIUS33XXX
                         Aba: 021000089
                         A/C no: 36251442

1st hire and value of bunker on delivery to be paid within 3 banking days aft vessels delivery - Owners to provide hire invoice in advance to Charterers.

### Clause 31

Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment", due to oversight or negligence or error or omission of Charterers' employees, bankers or agents, Owners shall notify Charterers in writing whereupon Charterers will have three banking days to rectify the failure; where so rectified the payment shall stand as punctual and regular payment.

### Clause 32

Charterers to have the right to withhold from Charter hire, during the period of this Charter, such amounts due to off-hire but properly substantiated. Charterers to have the right to withhold from hire payments Owners' estimated advances and disbursements, maximum USD 750 per port. Charterers have the right to withhold from last hire(s) payment the value of the estimated quantity of bunkers on redelivery.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

## Clause 33
### Boycott Clause

In the event of the vessel being boycotted by I.T.F., delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, ownership, crew, terms of employment of officers or crew or any other vessel under the same ownership, operation or control, all time lost is to be considered as off-hire and expenses and liabilities incurred thereby to be for Owners' account.

## Clause 34

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra directly related expenses and directly related actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents, or by reason of cargo carried.

## Clause 35

Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers or by Charterers' servants and to be for Owners' account if caused by Master, officers, crew or Owners' servants.

## Clause 36

Deleted.

## Clause 37

Any delay, directly related expense or directly related loss by reason of non-compliance with regulations, lack of proper documentation or equipment as per Clause 29 and 46 to 50 or on any breach of said Clauses to be for Owners' account.

## Clause 38

Deleted.

## Clause 39

If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 50 or because of lack of said certificates, any time so lost shall be treated as off-hire and all extra expenses incurred, directly resulting from such failure, shall be for Owners' account.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

### Clause 40

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.
All fuel used by the vessel while off-hire shall be for Owners' account.

### Clause 41

Deleted.

### Clause 42

Hire as specified in line 51 to include among other operations, usually performed by the crew unless prohibited by shore regulations such as:
- opening and/or closing of hatches,
- Watchmen in holds for supervision of loading and discharging,
- Docking/undocking/shifting/ballasting and bunkering,
- Shape up hatches/holds as much as possible prior to arrival at loading and/or discharging port/docks/anchorage, so that loading and/or discharging operations can commence immediately provided weather permits and provided such work can be safely done en route.

### Clause 43
### Bunkering Clause

Vessel to be delivery with bunkers as on board which expect to be about 700 / 800 mt IFO and about 80 / 100 mt MGO.

Charterers to redelivery vessel with about same quantities as those actually on delivery.

Prices to apply bends USD 400 pmt IFO and USD 700 pmt MGO.

Charterers to pay for bunkers on delivery together with first hire payment and Charterers to deduct value of redelivery bunkers from last sufficient hire payment(s).

Owners to have the option of bunkering the vessel for their own account provided same does not interfere with Charterers operations.

The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which strictly conform to the specifications as set out in vessel's description:

The Charterers shall be liable for any loss or damage to the Owners caused by the supply of unsuitable fuels or fuels which do not comply with the specifications set out hereabove

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

and the Owners shall not be held liable for any reduction in the vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences arising as a result of such supply.

### Clause 44

Charterers have the privilege to bunker the vessel prior delivery, provided same does not interfere with Owners' operations.

### Clause 45

Owners warrant that vessel is eligible and equipped to bunker in the U.S.A., its territories and possessions and in all countries to which vessel is allowed to trade under this Charter.

### Clause 46
### Certificates – Warranties Clause

The Owners are to provide and keep on board valid Deratization Certificates throughout the Charter period. Deratization shall always be for Owners' account.

### Clause 47

Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations and all current requirements at all ports of call, Panama and Suez Canal included.

### Clause 48

For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the classification society and International Authority International Grain Code (RES MSC 23(59)) on the basis of the SOLAS 1974 regulations and latest amendments thereto.

### Clause 49

Vessel to be fit for grab discharge and no cargo to be loaded in places inaccessible to grabs or deeptanks. Charterers to have the privilege of using rubber wheels bulldozers in vessel's holds. However, gross unit weight of bulldozers will not exceed vessel's tanktop strength.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

### Clause 50

The Owners undertake that all equipment shall confirm with regulations in all ports visited by the vessel and that the vessel is at all time in possession of valid certificates to comply with such regulations.

### Clause 51

Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries.

### Clause 52
### Insurance Clause

Owners shall maintain and carry on board a valid P. and I. Entry Certificate containing the oil pollution limitation of Cover Clause. Owners by production of a Certificate of Insurance or otherwise shall satisfy the requirements of (a) Section 311 (p) of the United States Federal Pollution Control Act, as amended through 1978 (33 US Code Section 1321 (p), (b) Articles VII of the International Convention of Civil Liability for Oil Pollution Damage 1969 as far as applicable, (c) a valid and up-to-date Certificate for Financial Responsibility as required under the Oil Pollution Act 1990). Owners to remain responsible for all consequences that may occur including extra expenses and/or off-hire periods for the vessel as a result of not having such valid and up-to-date certificate on board at all times during the currency of this Charter.

### Clause 53

Deleted.

### Clause 54

Deleted.

### Clause 55

In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, C.I.S., P.R. of China, United Kingdom, Japan, both Charterers and Owners have the option of cancelling this Charter Party without redress to either party.

It is understood that war means direct war between these nations and does include local hostilities or civil war where any of the above countries support opposing sides.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

Owners shall not unreasonably take advantage of this Clause in case of a limited local conflict. Neither Owners, nor Charterers shall unreasonably take advantage of this Clause in case of a limited local conflict.

### Clause 56

The basic war risk insurance premium to be for Owners' account. If Charterers order the vessel to or declare a port that is (at the time of the order or declaration) subject to an additional war risk premium or becomes prior to or during vessel's stay in the port subject to an additional war risk premium or the route to such port crosses or transits an additional war risk premium area, the additional premium which is payable on vessel's insured value of US$ 45,000,000.00 including the additional premium for blocking and trapping, if any, shall be for Charterers' account, as well as war risk bonus to crew as quoted by vessel's War Risk Underwriters.

### Clause 57
### Bills Of Lading/Cargo Claims

This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 1993 as attached, which are to be incorporated in all Bills of Lading issued under this Charter. Above Clauses as attached.

All Bills of Lading issued under this Charter will incorporate the General Paramount Clause or U.S.A. Clause Paramount or Canadian Clause Paramount, whichever is applicable, as attached.

No liner Bill(s) of Lading, no liner Waybills, no through and no combined transport Bill(s) of Lading to be issued under this Charter Party. No Hamburg Rules or other legislation imposing liability more or above Hague-Visby Rules will be incorporated in the Bill(s) of Lading.

### Clause 58
### Trading Exclusion Clause

New Zealand, Finland, Sweden, Angola (including Cabinda), Democratic Republic Congo (formerly Zaire), Iraq, Eritrea, Haiti, Israel, Lebanon, Liberia, Sea of Azov, Sierra Leone, Somalia, Srilanka, Albania, Ethiopia, Mauritania, Cambodia, Cuba, North Korea, Alaska, Iceland, Turkish occupied Cyprus, CIS pacific (between 40 and 60 degrees north).

No direct sailing between Taiwan and China (or vice versa).

In West Africa, Syria and Yemen, all cargo claims to be for Charterers' account and to be settled at Charterers' time, expense, responsibility and the vessel to remain always on hire.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

Notwithstanding the exclusion of Azov Sea, Charterers are allowed to call Mariupol during summer months.

Notwithstanding the exclusion of Sri Lanka, Charterers allowed to call Colombo for bunkers.

### Clause 59
### Cargo Exclusions

All cargo to be loaded/stowed/shipped and discharged strictly in accordance with IMO regulations.

No dangerous and/or inflammable and/or injurious cargo no cargo listed in the IMO blue books (IMDG code), no cargoes classified under appx b of BC code, including but not limited to the following: acids, ammonium nitrate, ammonium sulphate, arms and ammunition, asbestos, asphalt, bones and bone meals, borax, calcium carbide, calcium hypochlorate, caustic soda, cement and cement clinkers, charcoal, chilean nitrates, copra, coffee, cocoa, containers, concentrates, Cotton, creosoted goods, deck cargo, direct reduced iron ore and its products including HBI, explosives, ferro silicon, Fishmeal, granite blocks, hides, indian coals, livestock, logs, lime, Milled rice, bulk rice, manio and manioca pellets, mobile homes, motor vehicles, motor blocks, motor spirits, naphtha, niger seeds, nuclear Materials and radio active waste, oil cakes, petroleum and its Products including petcoke, pitch, pond coal, radio isotopes, salt, Salt cake, scrap, slurry, soda ash, sodium sulphate in bulk, sponge Iron, sulphur, tar, turnings, turpentine, yachts, sunflower seed Expellers and other expellers, but mechanically extracted palm kernel Expellers (not solvent extracted) are allowed.

Ammonium nitrate + ammonium sulphate harmless fertilizer grade allowed provided same not appendix B "
Notwithstanding above cargo exclusions, Charterers have the option to load max 2 cargoes of petcoke, max 2 cargoes of scrap max 1 cargo of salt, max 2 cargo of concentrate.

None of these cargoes will be last before redelivery or first after vessels dry docking. None of these cargoes cannot be loaded consecutively. Protective Clauses as per head c/p shall apply in case Charterers load said cargoes.

Pig iron allowed against protective clause as per herebelow.

Charterers allowed max 2 cargoes of concentrates which are to be loaded/stowed and discharged in strict accordance with IMO and any relevant local regulations.

Charterers' option to load bulk white rice, bulk brown rice, bulk paddy rice provided same is not appendix B.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

Cargo to be loaded in accordance with Owners P and I Club surveyors' requests and recommendations.

Charterers shall remain responsible for the passing of vessels holds and vessel shall remain on-hire throughout, irrespective of holds being accepted or not.

All cargo claims for above rice cargoes to be for Charterers' account and to be settled at Charterers' time, expense, responsibility and the vessel to remain always on hire.

Scrap
====

a)  The scrap mentioned herein only limited to non-oily HMS 1+2 and/or shredded scrap specifically excluding motor blocks, turnings, metal borings and cuttings.
b)  Charterers undertake that loading of first layer of scrap not to be released until lowered as close as possible to tanktop and not to be dumped/dropped during loading. First layer of scrap to be loaded at the height of tank top and not to be released until smoothly touching the tank top and to be evenly stowed/trimmed to satisfaction of Master before loading balance of cargo.
c)  Charterers undertake to supply onboard at their expense, dunnage and/or other materials which are necessary and reasonable to provide safe protection from damage by loading scrap.
d)  In case of any damage to the vessels' Australian Hold Ladders and any other parts/places of the vessel caused by loading such scrap cargo, Charterers to be responsible for upgrading/ repairs to bring Australian Hold Ladders and other parts/places to same condition as prior to loading scrap before commencement of next voyage in case needed.
e)  Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc) and any detention through any of above causes to be for Charterers account.

Petcoke
========

a)  Petroleum coke mentioned here in is only limited to the type of non-hazardous, nondangerous, green delayed type and/or calcined type and metallurgical coke
b)  If Charterers exercise such option, Charterers undertake to use holds as less as possible, provided vessels stability/ trim and stress permit and provided commercially allowed.
c)  Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest IMO and/or any other latest regulations/rules applicable to such cargo.
d)  Should any additional/special wash down of holds before loading be reasonably recommended proposed required by Master, Charterers undertake to arrange the same at their time/ expense.
e)  After discharge Charterers to arrange at their expense/time of any additional /special washdown of holds carrying such cargo by chemical as Master reasonably considers it necessary. Charterers are allowed to use ship's crew to

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

performs cleaning as necessary against paying USD 1500 per hold, but always subject to prior consent of Master/Crew and local regulations permit and all time so used to be for Charterers account.

f)   Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc) and any detention through any of the above causes to be for Charterers account.

Pig Iron

a)   Charterers undertake to use holds as few as possible, provided vessels stability and strengths permitting. Charterers undertake that loading of first layer of pig iron not to be released until lowered as close as possible to tank top and not to be dumped/dropped during loading, so as to provide a cushion flooring for the balance of cargo under the Master's supervision and his reasonable satisfaction.

b)   Charterers undertake to supply onboard, at their expense, dunnage and/or other materials which Master consider necessary to provide safe protection from damage by loading pig iron.

c)   In case during en route from loading to discharging port, cargo was found to shift which may affect the seaworthiness or safety of the vessel, Owners have the right to call at nearest port for necessary cargo trim, all time /expenses incurred to be for Charterers account and vessel to remain on hire for period.

Salt

a)   Charterers undertake to use holds as few as possible, provided vessels stability and strengths permitting.

b)   Before loading, all holds assigned for salt to be lime-washed by Charterers at their time/risk/expense/responsibility to the satisfaction of Master and independent surveyors appointed by Charterers at their time and expense. Charterers to arrange to supply onboard the vessel the required lime.

c)   Cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo.

d)   After discharge Charterers to supply sufficient fresh water at their expense for washing down of all holds. Any directly related extra expenses resulting therefrom /incurred thereby (such as hold cleaning to Masters satisfaction/hold survey etc) and any detention through above causes to be for Charterers account

e)   Charterers are allowed to use ships crew to perform lime washing and removal of same and repainting as necessary against paying USD 2500 per hold, but always subject to prior consent of Master/Crew and local regulations permitting, and all time use to be for Charterers account.

f)   Owners/Master are not to be held responsible for passing hold cleanliness for loading next cargo and for any consequence whatsoever caused due to such arrangement.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ˢᵀ AUGUST 2007

### Concentrate

Concentrate cargo to be loaded / stowed / carried and discharged in strict accordance with IMO and local regulations. Any additional certification required to load above cargo by local authorities / IMO regulations to be provided by Charterers at their expense.

Prior to loading Charterers to provide full specs of cargo including but not limited to moisture content and such specification to be consistent with local / IMO regulations.

### Clause 60
### Redelivery Clause

Charterers to give Owners 25 / 20 / 15 / 10 / 7 days approximate and 5 / 3 / 1 day(s) definite notice of redelivery date and port.

### Clause 61

Vessel will strictly observe all United Nations rules/sanctions in respect of cargoes and countries traded under this Charter Party.

### Clause 62
### Stevedore Clause

Should any damage be caused to the vessel or her fittings by the stevedores, the Master shall notify in writing to the responsible stevedores with copy to Charterers and their agents at time of occurrence of the damage or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to have the damage repaired or made good by the stevedores without delay and endeavour to obtain from the stevedores a written acknowledgement specifying the extent of the damage, unless the damage has been repaired or made good in the meantime.
Surveyor's report to be presented immediately to Charterers.
If stevedores refuse to repair and settle or acknowledge the damage as aforesaid, the Master shall immediately request stevedores to attend a joint survey of the damage and advise Charterers and their agents accordingly about the result of the survey. If stevedores refuse to attend the survey then Master has to arrange the survey by an independent surveyor at Charterers' time, expense, responsibility.

Charterers to be responsible for damage (wear and tear excepted) caused by negligence of stevedores only if not repaired or made good by stevedores and provided Master has complied with instructions as aforesaid. Charterers shall in addition reimburse Owners for the cost of the independent surveyor.
Charterers have the option of redelivering vessel without repairing damage for which they are responsible unless such damage is affecting vessel's seaworthiness or cargoworthiness in which case should be repaired without delay after occurrence at

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

Charterers' time to the satisfaction of vessel's class and should be paid by Charterers. Owners agree that other damage for which Charterers are responsible may remain for occasional repair when the ship is to be docked for Owners' account so that Charterers to pay actual cost of repair but not time used.

## Clause 63
### Cargo Holds
### Intermediate Hold Cleaning

Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning all cargo compartments in preparation for the next cargo, if required by the Charterers and if not prevented by any regulations or agreement whatsoever. Such cleaning work shall be performed while the vessel is en route to next loading port, provided that this can be safely done and that the duration of voyage is sufficient. The Charterers shall pay to the Owners USD 500 per hold if only sweeping has been required by the Charterers and USD 700 per hold if sweeping and washing has been required by the Charterers each time such cleaning is performed. Intermediate hold cleaning for dirty cargoes as per protective clauses (see clause 59.)

The Owners will endeavour to effect such cleaning as best possible, but without any guarantee that the cargo holds/hatches will be sufficiently cleaned and accepted or arrival at the loading port and the vessel not to placed off-hire for any reason whatsoever and the Owners shall not be responsible for any consequences or delays or expenses arising from the fact that the crew has been employed in cleaning.

### In Lieu Of Hold Cleaning

Charterers have the option of redelivering vessel unclean paying US$ 4,000.00 excluding excluding all dunnage, lashing debris removal/ disposal which to be done by Charterers in their time and at their expense.

## Clause 64
### Ballasting Clause

Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity and eventually to flood no. 4 hold only, in order to bring down vessel's height to get into position under loading and/or discharging appliances, however, always in conformity to free board and/or safety requirements.

## Clause 65
### Agency Clause

Charterers agree to have their agents attend, if required by the Owners, to all Owners' matters, Owners in such case to refund agents' outlays and to pay them customary agency fee in full but normal ship's husbandry (immigration, crew mail, cash advance) which shall be taken care of by Charterers' agents without agency fee except the agency fee

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

tariff valid for the respective port includes a general husbanding fee for the Owners. Owners have the right of appointing and paying their own agents. No Owners' expenses to be advanced by Charterers. Owners to put Master/agents in funds themselves. No deduction from hire for same.

### Clause 66

All reference to time is understood to be in local time except delivery/redelivery times which are to be GMT.

### Clause 67
### Bill of Lading

If required the Charterers use their own Bill of Lading, with reference to lines 78/79 of the Charter Party, the Charterers and/or their agents are hereby authorised by the Owners to sign on Master's behalf all Bills of Lading as presented in accordance with Mate's Receipts without prejudice to this Charter Party, but the Charterers are to accept all consequences that might result from the Charterers and/or their agents not adhering to the remarks in Mate's and Tally Clerk's Receipts.

### Clause 68
### Bimco Double Banking Clause

(a)   The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b)   The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)   Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)   The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause 69

Deleted.

### Clause 70
#### On-/Off-Hire Survey

Charterers to appoint a surveyor acting on their behalf for performing a joint on- and offhire bunker and condition survey. Joint on-hire survey to be in Owners' time only in so far as the survey hinders the vessel's operations performance at the time and joint off-hire survey to be in Charterers' time. Expenses to be shared equally.

### Clause 71

Deleted.

### Clause 72
#### Taxes/Dues

Any taxes and/or dues on the vessel, due to her flag and/or crew shall be for Owners' account. Any taxes and dues on cargo or freight or Charter hire to be for Charterers' account.

### Clause 73
#### Arbitration

Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers and in case the arbitrators shall not agree then to the decision of an Umpire to be appointed by them, the award of the arbitrators or the Umpire to be final and binding upon both parties.

If either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, either originally or by way of substitution as aforesaid, for seven clear days after the other party having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. All arbitrators are to be conversant with shipping matters.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

This contract is governed in English Law and there shall apply to all proceeding under this Clause the terms of the London Maritime Arbitrators Association current at the time when the arbitration proceedings were commenced.

All appointees shall be members of the Association (L.M.A.A. Arbitration Clause).

Where the amount involved is less than US$ 50,000.00 the dispute or difference shall be referred to arbitration according to the L.M.A.A. Small Claims Procedure 1989.

### Clause 74

Watchmen, if required by Master, to be paid for by the Owners. If watchmen are compulsory, according to port registrations or required by Charterers, same to be for Charterers' account. If U.S. coast guard/U.S. immigrations/port authorities in United States, order/require security guards/watchmen due to vessel's crew, visa, nationality of the crew, same to be for Owners' account.

### Clause 75

Charterers have the privilege of flying their own houseflag.

### Clause 76

The Charterers shall have the option to superficially inspect the vessel at any time during the period of the Charter Party and the Master/officers and crew to render all necessary cooperation.

### Clause 77

Deleted.

### Clause 78
### Delivery Notices

The Owners give delivery notice to Charterers upon fixing and then notice on fixing and 10 and 7 / 5 / 3 / 2 days approximate and 24 hours definite notice.

### Clause 79

Owners to guarantee that the vessel has not traded to/from any C.I.S./ex U.S.S.R. Pacific ports within the last 12 months. Furthermore, Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plant Protection Division and U.S.D.A. Plant Protection and Quarantine Office Regulations concerning the Asian Gypsy Moth. Furthermore Owners guarantee that the vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

Should the vessel be found to have same, vessel to be considered off-hire until the vessel
has been passed/cleared by Canadian/U.S. authorities. All costs, consequences, losses,
damages including but not limited to loss of sale/purchase to be for Owners' account.

**Clause 80**
**Dry Dock Break Clause**

Vessels next drydocking is due may - july 08. Vessel will be drydocked in the feast for a
period estimated to last about 7 / 15 days without guarantee. Charterers to bring the
vessel to 1 safe port Singapore / Japan range and deliver to owner for drydock purposes.

Vessel to be placed off-hire upon delivery last outward sea pilot one safe port Singapore /
Japan range. All fuel used by the vessel while off-hire shall be for Owners' account.

Vessel shall be put back on hire at delivery last outward sea pilot dockyard or in
Charterer's option at a position of max equivalent distance from last discharge port to the
Charterers' next destination with Owners' giving 15 / 10 / 5 / 3 / 2 / 1 days notice to
Charterers.

Charterers have the right/option to add such off-hire to charter party period duration.

Owners to notify Charterers 70 days in advance where and when drydock to be
performed.

**Clause 81**

Owner's option to sell vessel during the currency of the Charter Party and new Owners to
remain responsible to fulfil all obligations under the Charter Party.

**Clause 82**

Deleted.

**Clause 83**

Deleted.

**Clause 84**

Managers on behalf of the Owners confirm that they have signed the Sea Carriers
Initiative Agreement and that they will follow such rules.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

### Clause 85

All cargo claims to be settled in accordance with Interclub Agreement as amended on September 1996 or any later amendments.

### Clause 86

Negotiations and fixture to be in accordance with English Law, Arbitration in London and English Law to apply and to be kept strictly private and confidential.

### Clause 87

Owners guarantee vessel is not blacklisted by Richards Bay Coal Terminal.

### Clause 88
### I.T.F. - Bonafide

Vessel's officers/crew are covered for the duration of this Charter Party by an I.T.F. Agreement or equivalent.

### Clause 89
### L.O.I. Clause

If the original Bill(s) of Lading are not available at the discharge port the Charterers to issue a Letter of Indemnity in accordance with the Owners' P. and I. Club form signed by the Charterers only against which the Owners agree to discharge the cargo without presentation of the original Bill(s) of Lading.
The Letter of Indemnity to be printed on the Charterers' letterhead paper and signed by an authorised signatory. The Letter of Indemnity to be faxed prior to commencement of discharge to the Owners for approval and followed by original.

### Clause 90
### Mobile Cranes

Charterers at liberty to place mobile cranes on deck to facilitate discharge, all costs and time and risk to be for Charterers' account and sufficient dunnage (if required by class or Master) to be placed underneath the cranes to spread the weight, which in any case not to exceed permissible deck strength. Should any cutting or welding or reinforcement be necessary on ailings or other deck fittings to accommodate the placement of such cranes on deck, then risk, expenses and time of such works to be for Charterers' account.

Charterers will be fully responsible for any and all damages, times, expenses and costs (including but not limited to all burnt paint on deck and underneath, normal wear and tear excepted) and that all works to be under Master/officers supervision and to classification

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

societies and Masters' satisfaction. Cutting or welding of hatch covers is strictly
prohibited.

## Clause 91
### BIMCO Standard ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code
in relation to the vessel and thereafter during the currency of this Charter Party, the
Owners shall procure that both the vessel and "the Company" (as defined by the ISM
Code) shall comply with the requirements of the ISM Code. Upon request the Owners
shall provide a copy of the relevant Document of Compliance (DOC) and Safety
Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused
by failure on the part of the Owners or "the Company" to comply with the ISM Code
shall be for the Owners' account.

## Clause 92
### BIMCO Cancelcon 2002

(a) Should the vessel not be ready to load (whether in berth or not) on the agreed
cancelling date, the Charterers shall have the option of cancelling this Charter
Party.

(b) Should the Owners anticipate that, despite the exercise of due diligence, the vessel
will not be ready to load by the cancelling date, they shall notify the Charterers
thereof without delay stating the expected date of the vessel's readiness to load
and asking whether the Charterers will exercise their option of cancelling the
Charter Party, or agree to a new cancelling date.

Such option must be declared by the Charterers within 48 running hours after the
receipt of the Owners' notice. If the Charterers do not exercise their option of
cancelling, then this Charter Party shall be deemed to be amended such that the
seventh day after the new readiness date stated in the Owners' notification to the
Charterers shall be the new cancelling date.

The provisions of sub-clause (b) of this Clause shall operate only once, and in
case of the vessel's further delay, the Charterers shall have the option of
cancelling the Charter Party as per sub-clause (a) of this Clause.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

## Clause 93
### Fumigation Clause

If cargo is fumigated after loading on request of Charterers and/or shippers and/or receivers and vessel requested by fumigation company in writing stating number of days and/or time to elapse not to ventilate and not to enter fumigated cargo holds during sea voyage, then Owners not to be responsible for any cargo damage whatsoever as a result of fumigation of cargo and/or holds. Any fumigation required to be in Charterers' time, risk and expense.
During fumigation, if allowed by port authorities/local regulations crew to remain on board.
If shore regulations/port authority/local regulations require crew to leave the vessel then any/all expenses incurred for accommodation/victualling/transportation of the crew to be for Charterers' account.

## Clause 94
### B/L Splitting Clause

Charterers and/or agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading which be handed over to the Owners or their representative prior issuing various delivery orders. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice Shipowners' rights.

## Clause 95

Deleted. (See Clause 81)

## Clause 96
### Bunker Fuel Sulphur Content Clause For Time Charter Parties 2005

(a)     Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-clause (a).

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

(b)     Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-clause (a), the Owners warrant that:

    (i)     The vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

    (ii)    The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessels failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c)     For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental

## Clause 97

The BIMCO ISPS/MTSA Clause for Time Charter Parties 2005 as well as the U.S Customs Advance notification/AMS clause for Time Charter Parties to be fully incorporated in this Charter Party.

## Clause 98
### Japanese Seaway Bill Clause

Charterers have an option to issue non-negotiable seaway bill in lieu of Bills of Lading in which case Charterers instruct Master to release cargo without Bills of Lading and L.O.I. Charterers hereby agree to indemnify Owners/Master against any consequences arising therefrom. However in order to avoid any discrepancies the Master will be supplied with copies of the relevant seaway bills latest prior to commencement of discharge. This only applies when trading to Japan. The goods shipped under the waybill should be delivered to the party named in the waybill against the waybill and against production of sufficient proof of identity to Master's/Owners' satisfaction.

## Clause 99
### Off-hire Clause

Charterers' option to add all off-hire at the end of the charter period but Charterers to declare such option latest 25 days prior to redelivery.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

## BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

## NEW BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or noncarrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL PARAMOUNT CLAUSES

In respect of all Bills of Lading issued under this Charter Party other than Bills of Lading to or from United States or from Canadian or United Kingdom ports, all Bill of Lading issued under this Charter Party shall contain the following clause:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by Sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein but nothing herein contained shall be deemed a surrender by the Carriers of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from or limitation of liability.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

## U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities under said Act. The provision stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

## CANADIAN CLAUSE PARAMOUNT

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936, and of the rules compromising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, right and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions, it shall to the extend of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and whatsoever occurring when such loss or damage arises prior to the loading and/or subsequent to the discharge from the carrier's ship.

## NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which the carrier is not responsible by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said such salving ship or ships belonged to strangers.

Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery."
And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
CODE NAME: "CONWARTIME 1993"

1.    For the purpose of this Clause, the words:

    a.    "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the vessel and the Master and

    b.    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group or the government of any state whatsoever which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through any port, place, area or zone (whether of land or sea) or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to war risks. Should the vessel be within any such place as aforesaid which only becomes dangerous or is likely to be or to become dangerous after her entry into it, she shall be at liberty to leave it.

3.    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels or is imposed selectively in any way whatsoever against vessels of certain flags or ownership or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

4.    a.    The Owners may effect war risks insurance in respect of the hull and machinery of the Vessel and their other interests (including, but not limited to loss of earnings and detention, the crew and their Protection and Indemnity risk), and the premiums and/or calls therefore shall be for their account.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

b.    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within or is due to enter and remain within any area or areas which are specified by such underwriters as being subject to additional premiums because of war risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.    The Vessel shall have liberty:

a.    To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever which are given by the government of the Nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b.    To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

c.    To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

d.    To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e.    To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

7.    If in accordance with their rights under the foregoing provisions of this Clause the
Owners shall refuse to proceed to the loading or discharging ports or any one or
more of them, they shall immediately inform the Charterers. No cargo shall be
discharged at any alternative port without first giving the Charterers notice of the
Owners' intention to do so and requesting them to nominate a safe port for such
discharge. Failing such nomination by the Charterers within 48 hours of the
receipt of such notice and request, the Owners may discharge the cargo at any
safe port of their own choice.

8.    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause
anything is done or not done, such shall not be deemed a deviation, but shall be
considered as due fulfilment of this Charter Party.

## ISPS CLAUSE FOR TIME CHARTER PARTIES

(A)    (I)    From the date of coming into force of the International Code for the
Security of Ships and of Port facilities and the relevant amendments to
chapter XI of Solas (ISPS code) in relation to the vessel and thereafter
during the currency of this charter party, The Owners shall procure that
both the vessel and the Company (as defined by the ISPS Code) shall
comply with the requirements of the ISPS Code relating to the vessel and
the Company upon request the Owners shall provide a copy of the relevant
International Ship Security Certificate (or the Interim International Ship
Security Certificate) to the Charterers. The Owners shall provide the
Charterers with the full style contact details of the Company Security
Officer (CSO).

(II)    Except as otherwise provided in this Charter Party, loss, damage, expense
or delay, excluding consequential loss, caused by failure on the part of the
Owners or the Company to comply with the requirements of the ISPS
Code or this clause shall be for the Owners account.

(B)    (I)    The Charterers shall provide the CSO and the Ship Security Officer
(SSO)/Master with their full style contact details and, where sub-letting is
permitted under the terms of this Charter Party, shall ensure that the
contact details of all subcharterers are likewise provided to the CSO and
the SSO/Master.
Furthermore, the Charterers shall ensure that all sub-Charter Parties they
enter into during the period of this Charter Party contain the following
provision:

The Charterers shall provide the Owners with their full style contact
details and, where sub-letting is permitted under the terms of the Charter
Party, shall ensure that the contact details of all sub-Charterers are
likewise provided to the Owners.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

(II)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers account.

(C)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers account, unless such costs or expenses result solely from the Owners negligence. All measures required by the Owners to comply with the ship security plan shall be for the Owners account.

(D)    If either party makes any payment which is for the other parties account according to this clause, the other party shall indemnify the paying party.

## AMS CLAUSE FOR CHARTER PARTIES

(a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i)    Have in place a SCAC (Standard Carriers Alpha Code)
(ii)    Have in place an ICB (International Carrier Bond)
(iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
(iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited o legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this charter Party to the contrary, the Vessel shall remain on hire.

(c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

M/V "APOSTOLOS II"
ADDITIONAL CLAUSES TO THE CHARTER PARTY
DATED LONDON 1ST AUGUST 2007

(d)    The assumption of the role of carriers by the Charterers pursuant to this Clause
and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without
prejudice to the identity of carrier under any bill of lading, other contract, law or
regulation.