# LENNON, MURPHY & LENNON, LLC – *Attorneys at Law*

| | | |
|---|---|---|
| The GrayBar Building | Patrick F. Lennon - *pfl@lenmur.com* | Tide Mill Landing |
| 420 Lexington Ave., Suite 300 | Charles E. Murphy – *cem@lenmur.com* | 2425 Post Road |
| New York, NY 10170 | Kevin J. Lennon – *kjl@lenmur.com* | Southport, CT 06890 |
| *phone* (212) 490-6050 | Nancy R. Peterson – *nrp@lenmur.com* | *phone* (203) 256-8600 |
| *fax* (212) 490-6070 | | *fax* (203) 256-8615 |

October 10, 2007

**<u>*Via Facsimile: (212) 805-6390*</u>**
Hon. William H. Pauley
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

Re:   <u>**The Rice Co. v. Express Sea Transport Corp.**</u>
      Docket No.: 07 Civ. 7077 (WHP)
      LML ref: 1213

Dear Judge Pauley:

  We represent the Defendant in the above-captioned case. On October 5, 2007 the Court heard oral argument on Defendant's Motion to Vacate Maritime Attachment. At that hearing, Plaintiff produced to the Court a sur-reply submission, *i.e.*, Garat Declaration dated October 4, 2007, and the Court allowed Defendant until today to file its own sur-reply. We respectfully submit this letter as Defendant's sur-reply.

  The Court should take note that Mr. Garat continues to avoid what Plaintiff earned for the Iranian voyage. Also, his explanation for using July 23 as the damages assessment date is not credible, he is still concerning himself with a market outlook based on spot charter indices, and the business he mentions in Paragraph 11 is unhelpful because it relates to (a) the market in May, which is irrelevant, and (b) what Plaintiff might apparently have been able to earn as income early on in the charter, rather than what it would have cost them to replace the one year charter of the "Apostolos II" with another one year charter for a similar vessel, which is the proper English law measure of damages.

  In respect of Plaintiff's illegal trade to Iran, at the hearing the Court inquired whether there was a case that held that a court has discretion to vacate an attachment where a plaintiff sought to benefit from its illegal trade to Iran in contravention of U.S. foreign policy. In response to that inquiry we are pleased to attach *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240 (2d Cir. 1991), in which the Second Circuit affirmed Judge Owen's granting of a defendant's motion for summary judgment, and denial of plaintiff's subsequent motion to vacate dismissal, under facts that are remarkably similar to the ones in this case.

Hon. William H. Pauley
October 10, 2007
Page two

---

In *National Petrochemical Co. of Iran* it was undisputed that the contract to trade to Iran was "a scheme to transport the cargoes for payment of monies between the U.S. and Iran, without detection in contravention of the then existing laws and trade embargoes between the two countries." *Id.* at 243. The Second Circuit held that "Thus, even assuming that, viewed in isolation, the contracts underlying its [plaintiff's] claims are legal, NPC is nonetheless prohibited from enforcing those agreements in a United States court because they are admittedly part and parcel of a larger plain to violate the United States trade embargo." *Id.*

Respectfully submitted,

*/s/ Charles E. Murphy*

Charles E. Murphy
Patrick F. Lennon

CEM/bhs
Enclosure

cc:     *Via Facsimile: (212) 669-0699*
        Keith B. Dallen, Esq.
        Thomas Willoughby, Esq.
        Andrew R. Brown, Esq.
        Hill, Rivkins & Hadyen
        45 Broadway, Suite 1500
        New York, NY 10006

LEXSEE 930 F.2D 240, 243

NATIONAL PETROCHEMICAL COMPANY OF IRAN, Plaintiff-Appellant, v. THE M/T STOLT SHEAF, her engines, boilers, etc., POSIDEN NAVIGATION, INC., PARCEL TANKERS, INC., STOLT NIELSEN, INC., STOLT NIELSEN A/S, Defendants-Appellees

No. 1036, Docket No. 89-9132

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

930 F.2d 240; 1991 U.S. App. LEXIS 6079; 19 Fed. R. Serv. 3d (Callaghan) 923; 1991 AMC 1890

March 29, 1990, Argued
April 11, 1991, Decided

**SUBSEQUENT HISTORY:** As Amended July 2, 1991.

**PRIOR HISTORY:** [**1] Plaintiff-appellant National Petrochemical Company of Iran appeals from decisions of the United States District Court for the Southern District of New York, Richard Owen, Judge, granting the motion of defendants-appellees for summary judgment and denying plaintiff-appellant's subsequent motion to vacate the judgment and amend its complaint.

**DISPOSITION:** We Affirm.

**COUNSEL:** Richard D. Gaines, New York, New York, for Plaintiff-Appellant.

Brian D. Starer, New York, New York, (Charles B. Anderson, Richard A. Menchini, Don P. Murnane, Jr., Haight, Gardner, Poor & Havens, New York, New York, of Counsel), for Defendants-Appellees.

**JUDGES:** Oakes, Winter, and Mahoney, Circuit Judges.

**OPINION BY:** MAHONEY

**OPINION**

[*241] MAHONEY, Circuit Judge

In this action, plaintiff-appellant National Petrochemical Co. of Iran ("NPC") seeks damages from defendants for failure to deliver certain chemicals originally destined for Iran aboard the vessel Stolt Sheaf, but ultimately discharged at Taiwan after the outbreak of war between Iraq and Iran. Defendants are the tanker Stolt Sheaf, on which the chemicals in question were shipped from Houston, Texas, and various parties engaged in the ownership and operation of the Stolt Sheaf.

Upon remand from a decision by this [**2] court in *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551 (2d Cir. 1988), cert. denied, 489 U.S. 1081, 103 L. Ed. 2d 840, 109 S. Ct. 1535 (1989) ("*NPC I*"), that affirmed the right of NPC to maintain this action in American courts, the United States District Court for the Southern District of New York, Richard Owen, *Judge*, granted summary judgment to defendants. The district court ruled that NPC was barred from recovery because of its knowing efforts to violate United States law imposing an embargo upon the sale or other transfer of items, products, and commodities (other than excepted food, medical supplies and clothing) to Iran. See *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 722 F. Supp. 54 (S.D.N.Y. 1989)("*NPC II*"). The district court denied a subsequent motion by NPC to vacate the summary judgment and allow NPC to amend its complaint.

We affirm.

Background

On April 7, 1980, in response to the seizure by Iranian militants of the United States embassy in Tehran and the taking of fifty-two American diplomatic personnel as hostages, President Carter severed diplomatic relations with Iran and issued Executive Order 12205, [**3] 45 Fed. Reg. 24,099 (1980). The order proscribed, *inter alia*, "the sale, supply or other transfer, by any person subject to the jurisdiction of the United States, of any items, commodities or products . . . from the United States . . . either to or destined for Iran," with certain exceptions not presently pertinent. *Id.*

In June 1980, NPC, the parent company and purchasing agent for a number of Iranian subsidiaries, and a

930 F.2d 240, \*; 1991 U.S. App. LEXIS 6079, \*\*;
19 Fed. R. Serv. 3d (Callaghan) 923; 1991 AMC 1890

subsidiary that purchased for its own account, Abadan Petrochemical Company, sought to purchase supplies of certain urgently needed chemicals, ethylhexanol ("EH"), orthoxylene ("OX"), and ethylene dichloride ("EDC"), for delivery to Iran. The mutual trade embargoes existing between the United States and Iran, [1] however, rendered NPC's prior sources unavailable. NPC therefore approached various traders and brokers in order to secure new sources of supply.

> 1  In response to the United States embargo, Iran had outlawed the purchase of American products. See NPC II, 722 F. Supp. at 55 n. 2.

[\*\*4] NPC contracted with a middleman, Monnris Enterprises ("Monnris") of Dubai, United Arab Emirates, to purchase NPC's requirements of EH and OX. Monnris proceeded to secure the needed chemicals from Rotex Chemie Brunst & Co. of Hamburg, West Germany ("Rotex"). Rotex acted in this transaction, however, through a Swiss affiliate, Formula S.A., because West Germany, like the United States, had placed restraints on shipments to Iran.

Although the pertinent documents called for shipment of the EH and OX from "Any West European & UAE Ports," the EH and OX, as well as supplies of EDC for Abadan Petrochemical Company, were in fact purchased from suppliers in the United States and shipped from Houston, Texas aboard the Stolt Sheaf. Although the original charter party called for delivery of the [\*242] cargo from Texas to Barcelona, Spain, a subsequent addendum to that charter party specified Iran as the ultimate destination of the cargo.

In September 1980, war broke out between Iran and Iraq. Defendants notified NPC of their invocation of the war risk clause of the charter party and their concomitant request that the charterer, Rotex, name an alternate destination for the cargo aboard the Stolt Sheaf, [\*\*5] which by then was in the vicinity of Iran. Thereafter, by a second addendum to the charter party, Rotex ordered defendants to redirect the Stolt Sheaf to Taiwan, where Rotex successfully resold the cargo.

The sale in Taiwan was purportedly for the account of NPC, but NPC was unable to obtain the proceeds from Rotex and Formula. In resulting legal proceedings in Germany, Kuhn Mohamed, the proprietor of Monnris at the time of this transaction, stated in an affidavit that Monnris' relationship with NPC in this transaction resulted from the following situation:

> 1980 was . . . the time of the Iranian revolution and potential Iranian purchasers, as well as would-be suppliers to Iran, were looking for middle-men through whom contracts could be raised, so as to circumvent the effect of the trade sanctions applying to Iran. For my firm, and in general for all trading firms in Dubai, this was a very promising commercial opportunity . . . .

Mohamed also acknowledged that he knew by August 21, 1980, approximately a month before their intended delivery to Iran, that the Stolt Sheaf was bringing the chemicals from the United States, "but that the vessel would be calling at Barcelona where new [\*\*6] bills of lading would be issued either for that vessel or for another one."

Ashgar Bakhtiari, head of NPC's procurement department in 1980, also submitted a statement in the German proceedings which included the following with respect to the transaction at issue:

> Another term of sale was that third party bills were to be acceptable. I understood this to mean that Monnris Enterprises, although the sellers of the cargo to us, would not be shown as the shippers in the Bills of Lading. I also understood that the Bills would not necessarily reflect the true destination for the cargo, since they would originally show that the cargo was to be discharged for the account of Monnris and our identify [sic] as the final receiver and Bandar Khomeni as the Port of Discharge would not necessarily be mentioned. *Obviously, this might be necessary in order to avoid any regulations giving effect to the economic sanctions.*

Emphasis added. Bakhtiari also asserted that "during the time of the economic sanctions applying to trade with Iran after the revolution, it was impossible in most cases to contact [manufacturers of raw materials] direct and we had to work through agents and middle men."

On September [\*\*7] 30, 1986, NPC commenced this action, claiming that defendants negligently and conspiratorily allowed Rotex to divert and resell the chemicals. Paragraph 18 of NPC's complaint alleged that "NPC or its agents, including Monriss [sic]" had contracted with Rotex for the delivery of the chemicals. The district court initially dismissed the complaint on the ground that NPC's status as a wholly-owned entity of the unrecognized Iranian government prevented its suing in a United States court, but this court, at the urging of the United

States as *amicus curiae*, reversed that determination in *NPC I*.

Upon remand, defendants moved to dismiss the complaint on the grounds that NPC sought to recover on an illegal contract and that its claim was time-barred. The district court granted summary judgment for defendants on the former ground, finding that "the agreement at issue in this case was illegal under the laws of the United States and Iran." *NPC II*, 722 F. Supp. at 55. The court concluded that NPC was barred from recovery because its "knowledge of the transaction's illegal purpose and the illegal arrangements necessarily made to have it succeed . . . [was] undisputed." [**8] *Id. at 56*. The court's opinion granting summary judgment included a statement that Monnris "was admittedly [*243] NPC's agent." *Id. at 55*. The district court subsequently denied a motion by NPC to vacate the summary judgment and allow NPC to amend its complaint to delete the reference to Monnris as NPC's agent.

This appeal followed.

Discussion

On appeal, NPC presents three grounds for reversal: 1) the contracts that NPC seeks to enforce were not illegal; 2) there was a material factual issue as to whether NPC was *in pari delicto* with regard to any illegality; and 3) the district court abused its discretion when it denied NPC's motion to vacate the judgment and to allow amendment of the complaint. We consider each of these contentions in turn.

A. *Illegality of Contracts*.

NPC claims that the contracts at issue in this suit were legal because the individual agreements, viewed separately, were not subject to the embargoes against shipments from the United States to Iran. Executive Order 12205, by its terms, applies to "any person subject to the jurisdiction of the United States." Thus, NPC contends that because Formula and Monnris were not subject [**9] to United States jurisdiction, their contracts to supply goods to Iran were outside the scope of the embargo. Similarly, it claims, the defendants, as foreign entities, could properly contract to make the shipments.

It is very doubtful, to begin with, that foreign entities which undertake to deliver goods from a United States port in violation of American law are not, in doing so, "subject to the jurisdiction of the United States." In any event, this reasoning ignores the undisputed fact that each contract was a component, in the words of NPC's complaint, of a "scheme to transport the cargoes for payment of monies between the U.S. and Iran, without detection in contravention of the then existing laws and trade embargoes between the two countries."

Applying New York contract law, we have previously determined that a perfectly legitimate contract may be rendered unenforceable by its "direct connection" with an illegal transaction. *See Bankers Trust Co. v. Litton Sys., 599 F.2d 488, 491 (2d Cir. 1979)* (citing *McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 166 N.E.2d 494, 199 N.Y.S.2d 483 (1960))*. While *Bankers* [**10] *Trust* involved New York's public policy against commercial bribery, we see no reason for a different rule where the public policy is that of the federal government. Thus, even assuming that, viewed in isolation, the contracts underlying its claims are legal, NPC is nonetheless prohibited from enforcing those agreements in a United States court because they are admittedly part and parcel of a larger plan to violate the United States trade embargo.

B. *In Pari Delicto*.

NPC further claims to have raised a genuine issue of material fact with regard to its assertion that it was unaware of the illegal origin of the cargo. This ignorance, says NPC, permits it to enforce the contract, notwithstanding any illegality, because NPC was not *in pari delicto* with those who intentionally violated the trade embargo. We will postulate that NPC might be entitled to enforce the contracts if it had been truly unaware of the illegality. *Cf. In re Leasing Consultants, Inc., 592 F.2d 103, 110-11 (2d Cir. 1979)* (bankruptcy trustee could recover the firm's payment to influence a Congressman because its creditors were "not alleged to have been involved in the illegal payment in [**11] any way"). NPC has failed, however, to raise a genuine issue with respect to its claimed ignorance.

As the district court recognized, NPC admitted in its complaint that Monnris Enterprises acted as NPC's agent in securing the chemicals from Rotex. Further, Bakhtiari's statement in the German proceedings acknowledged that during the embargo, NPC was forced to "work through agents and middle men." Mohamed's affidavit in the German litigation made clear that Monnris' role in the transaction at issue resulted from its seeking precisely such a "middle man" role in the circumstances posed by trade embargoes against Iran.

[*244] Contending that its admission of agency in its complaint is not conclusive, NPC points out that "Monnris posted letters of credit in its own name to purchase the cargo from Formula and issued a performance bond in its own name to NPC," and argues that such conduct disproves an agency relationship by demonstrating that Monnris was an independent contractor. The crucial element of an agency relationship, however, "is that the agent acts subject to the principal's direction and control." *In re Shulman Transp. Enters., 744 F.2d 293, 295 (2d Cir. 1984);* [**12] *see also National Union*

930 F.2d 240, *; 1991 U.S. App. LEXIS 6079, **;
19 Fed. R. Serv. 3d (Callaghan) 923; 1991 AMC 1890

*Fire Ins. Co. v. Turtur, 892 F.2d 199, 207 n.5 (2d Cir. 1989).* "An independent contractor, one who is not subject to the right of another to control his physical conduct in the performance of his undertaking, may or may not be an agent." *Columbia Broadcasting Sys. v. Stokeley-Van Camp, Inc., 522 F.2d 369, 375 (2d Cir. 1975)* (footnote omitted); *see also Anchor Sav. Bank v. Zenith Mortgage Co., 634 F.2d 704, 706 n.2 (2d Cir. 1980)* (citing *Columbia Broadcasting*); *Restatement (Second) of Agency § 2(3)* (1958). There can be little doubt on this record that with respect to the transaction at issue, Monnris acted subject to the direction and control of NPC. Thus, the evidence to which NPC directs us does not contradict its admission as to Monnris' agency.

Mohamed unequivocally states that he was told on August 21, 1980 that the chemicals at issue in this case were being shipped from the United States. Thus, Monnris, NPC's agent, knew of the illegal nature of the transaction -- that goods were being shipped from the United States to Iran. This knowledge is attributable to NPC, because "it is a basic tenet [**13] of the law of agency that the knowledge of an agent . . . is imputed to the principal." *Mallis v. Bankers Trust Co., 717 F.2d 683, 689 n. 9 (2d Cir. 1983); see generally Restatement (Second) of Agency § 272* (1958).

Finally, Bakhtiari's affidavit in the German proceedings established that "third party bills" of the precise sort utilized in this transaction "were to be acceptable . . . in order to avoid any regulations giving effect to the economic sanctions." Thus, not only was the knowledge of NPC's agent, Monnris, as to the illegality of the shipment attributable to NPC as a matter of law; the illegal shipment was part and parcel of a prior, agreed course of conduct designed to circumvent the embargo imposed by the United States. In sum, the district court correctly ruled that there was no genuine issue of fact whether NPC was *in pari delicto* as to the Stolt Sheaf shipment.

C. *NPC's Postjudgment Motion.*

Finally, NPC asserts that the district court abused its discretion by denying NPC's motion to vacate the summary judgment on the ground of mistake and to amend its complaint to withdraw its admission as to Monnris' agency.

A motion to vacate a judgment [**14] under *Fed. R. Civ. P. 60(b)* is addressed to the sound discretion of the trial court, whose disposition of the motion will not be disturbed on appeal absent an abuse of that discretion. *See Weissmann v. Freeman, 868 F.2d 1313, 1326 (2d Cir.), cert. denied, 493 U.S. 883, 107 L. Ed. 2d 172, 110 S. Ct. 219, (1989); International Controls Corp. v. Vesco, 556 F.2d 665, 670-71 (2d Cir. 1977), cert. denied, 434 U.S. 1014, 98 S. Ct. 730, 54 L. Ed. 2d 758 (1978); Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir. 1972)* (per curiam). NPC invoked the provision of *rule 60(b)(1)* which authorizes the court to vacate a judgment on the ground of mistake. The only "mistake" that NPC offered, however, was an assertedly erroneous application of the summary judgment standard by the district court. Since we have already concluded that summary judgment was properly granted, it follows that there was no abuse of discretion in denying the subsequent *rule 60(b)* motion.

NPC's claimed right to amend its complaint is equally without substance. It has been held that "once judgment is entered the filing of an amended complaint is not permissible until judgment is set aside or vacated [**15] pursuant to *Fed. R. Civ. P. 59(e)* or *60(b)*." *Cooper v. Shumway, 780 F.2d 27, 29 (10th Cir. 1985); see also Mitsubishi Aircraft Int'l v. Brady, 780 F.2d 1199, 1203 [*245] (5th Cir. 1986)* ("by the time the motion to amend was filed, there was no longer existent a claim to be amended, since summary judgment was already granted"); *cf., State Trading Corp. of India v. Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d Cir. 1990)* ("When the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly."); *Twohy v. First Nat'l Bank, 758 F.2d 1185, 1196 (7th Cir. 1985)* ("Several courts have recognized that justice may require something less in post-judgment situations than in pre-judgment situations under Rule 15(a)"). The merit of this approach is that "to hold otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation." 6 C. Wright & A. Miller, Federal Practice [**16] and Procedure § 1489, at 694 (1990).

We agree. Unless there is a valid basis to vacate the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint. Of course, in view of the provision in rule 15(a) that "leave [to amend] shall be freely given when justice so requires," *see Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*, it might be appropriate in a proper case to take into account the nature of the proposed amendment in deciding whether to vacate the previously entered judgment. Here, however, NPC belatedly seeks to amend its complaint to withdraw its admission therein of an agency that is abundantly supported in the record. The district court properly denied the application to amend.

Conclusion

The judgment of the district court is affirmed, as is its denial of NPC's postjudgment motion.